VIRGINIA MATTHEWS, PLAINTIFF-APPELLANT, AND STAN-
LEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF
NEW JERSEY, PLAINTIFF-INTERVENOR-APPELLANT, v.
BAY HEAD IMPROVEMENT ASSOCIATION, A NON-PROFIT
CORPORATION OF THE STATE OF NEW JERSEY; PHILIP D.
REED, JR.; PAUL E. PARKER & CATHERINE PARKER, H/W;
JAMES L. TYSON & DAVID O. TYSON; JOHN BOWMAN DEL-
ANEY; ROBERT L. JOHNSON & ROBERTA JOHNSON, H/W;
HELEN LOBLEIN; MARTHA L. VAN EMBURGH; H. CORBIN
DAY; CAROL C. SCHMITZ; BENJAMIN BARNETT & CATH-
ERINE, H/W; KATHERINE W. FORTENBAUGH; GEORGE P.
EGBERT; LESTER D. EGBERT; GEORGE O. NODYNE; AN-
DREW H. CAMPBELL; JOSEPH SHELBY & MIRIAM ROHRER
SHELBY; BRUCE B. SWENSON & NANCY T. SWENSON, H/W;.
FERDINAND W. ROEBLING, III; DOROTHY ANDERSON &
CLIFFORD O. ANDERSON; ESTATE OF EILEEN RUCKER;
MARY G. HILL; ROBERT S. CORBIN; JOHN A. BROWN;
GEORGE R. SCHULTZ; EDWARD MCGRATH & ELIZABETH
MCGRATH, H/W; WALTER H. BROWN & CATHERINE
BROWN, H/W; ALFRED E. JOHNSON, JR.; EDWARD F. &
JOAN VAN JOHNSON, H/W; JOHN MAGEE & ELIZABETH
MAGEE, H/W; FRANK J. O'BRIEN; EDITH WELLS PARDOE;
GEORGE H. & ESTELLE M. SANDS, H/W AND CLYDE A.
SZUCH, DEFENDANTS-RESPONDENTS, AND JOSEPH DECI-
BUS & HAZEL DECIBUS, H/W; FREDERICK MELLOR; WIL-
LIAM DE BRAY & VILMA DE BRAY, H/W; ELIZABETH M.
HEATH; F.W. CLARK & LUCILLE CLARK, H/W; HENRY
THUMAN; ELIZABETH MATTHEWS; PAUL SAMBORN;
HOWARD MCCLINTIC; DONALD LUSARDI; HENRY C. DAY;
M. DICKINSON; MARGARET B. DUNN; DICK ZUVER & JEAN
ZUVER, H/W; ALBERT ROBERT JOHNSON; ANDREW
CONTE; RICHARD OTTO & JUDITH OTTO, H/W; GORDON A.
WILLSPANGH; ELIZABETH HANUS; REBEKAH COLLINS;
MARIA A. CARMICHAEL; HERBERT J. GARMBOW; CARO-
LYN L. OTTLEY; FRANK E. CURRAN, JR.; DARWIN JAMES,
JR.; WILLIAM H. NIMICK, III; CLARK ESTATE; MARIAN R.
REICHEL; LAWRENCE BATHGATE & PAMELA BATHGATE,
H/W; RICARDO MESTRES; BEVERLY ROBERTSON; WIL-
LIAM SPOFFORD; AUSTIN STARKEY; HENRY GIBSON;
HENRY SMITH; BARR ELIZABETH LOIZEAUX; ALBERT
DITTMAN; TRISTINA JOHNSON; QUAIL HILL ESTATES;
ASH ASSOCIATION; MALVERN C. BURROUGHS; HERB &
ANN DRAESEL, H/W; FLORENCE EBERHARDT; PETER
HAUSMANN; THOMAS JONES & VERA JONES, H/W; JAMES
W. KELLEY; MORGAN MACOM & MARY MACOM, H/W;

JOHN F. MOORE; DONALD A. PICKERING & DOROTHY PICK-
ERING, H/W; ELIZABETH H. STRECCH; ZORLAS, JAMES &
BARBARA, H/W; WALTER & MARION BRAUN, H/W; DAVID
& SHIRLEY GAESFORD, H/W; HERBGMARTH-TAYLOR ROSS
& AMY WRIGHT, H/W AND MARX & GUILIANA RENZULLI,
H/W, DEFENDANTS, AND MRS. PAUL HAY; EDWARD H.
HEIN; HAROLD L. HERBERT; ROBERT KING; HERMAN
SCHMITZ; CHRISTINE WILDER; SAMUEL B. FORTEN-
BAUGH, JR.; GREGORY GIBSON; ANN F. MESTRES; DORO-
THY L. CORBIN; MAX HABERNICKEL, III & GAEL S. HA-
BERNICKEL, H/W; J. STUART HILL; RICARDO A. MESTRES,
JR.; ANNE K. NODYNE AND ELIZABETH B. REED, RESPON-
DENTS NOT NAMED IN THE COMPLAINT.

Argued May 10, 1983—Decided February 2, 1984.

308

310

Sandra T. Ayres, Deputy Public Advocate, Division of Public Interest Advocacy, argued the cause for appellants (*Joseph H. Rodriguez*, Public Advocate, attorney).

*Alvin Weiss* argued the cause for respondents Clifford O. Anderson & Dorothy Anderson; Benjamin & Catherine Barnett, h/w; John A. Brown; Walter H. Brown & Catherine Brown, h/w; Andrew H. Campbell; H. Corbin Day; Samuel B. Fortenbaugh, Jr. & Katherine W. Fortenbaugh, h/w; Gregory Gibson; Mrs. Paul Hay; Edward H. Hein; Harold L. Herbert; Edward F. & Joan Van Johnson, h/w; Robert King; Edward McGrath & Elizabeth McGrath, h/w; Ann F. Mestres; Paul E. Parker & Catherine Parker, h/w; Philip D. Reed, Jr.; Estate of Eileen Rucker; George H. & Estelle M. Sands, h/w; Herman Schmitz; Joseph Shelby & Miriam Rohrer Shelby; David O. Tyson; James L. Tyson and Christine Wilder (*Riker, Danzig, Scherer & Hyland,* attorneys; *Glenn Clark* and *Andrew Manshel,* on the brief).

*John R. Weigel* argued the cause for respondents John A. Brown; Robert S. Corbin & Dorothy L. Corbin, h/w; Samuel B. Fortenbaugh, Jr. & Katherine W. Fortenbaugh, h/w; Max Habernickel, III & Gael S. Habernickel, h/w; J. Stuart Hill & Mary G. Hill, h/w; Ricardo A. Mestres, Jr.; George O. Nodyne & Anne K. Nodyne, h/w; Philip D. Reed, Jr. & Elizabeth B. Reed, h/w; Ferdinand W. Roebling, III; Carol C. Schmitz; George R. Schultz and Bruce B. Swenson & Nancy T. Swenson, h/w (*John R. Weigel* and *Joseph M. Clayton, Jr.,* attorneys; *Joseph M. Clayton, Jr.,* on the brief).

*Richard H. Woods* argued the cause for respondents Bay Head Improvement Association, etc.; John Bowman Delaney; George P. Egbert; Lester D. Egbert; Alfred E. Johnson, Jr.; Robert L. Johnson and Roberta Johnson, h/w; Helen Loblein; John Magee & Elizabeth Magee, h/w; Edith Wells Pardoe and Martha L. Van Emburgh (*Schuman & Butz,* attorneys).

*Frank J. O'Brien* submitted a letter brief, *pro se.*

*Clyde A. Szuch* submitted briefs, *pro se* (*Clyde A. Szuch,* attorney; *J. Michael Nolan, Jr., Jeri E. Ruscoll* and *Peter A. Scarpato,* on the briefs).

The opinion of the Court was delivered by

SCHREIBER, J.

■ The public trust doctrine acknowledges that the owner-ship, dominion and sovereignty over land flowed by tidal waters, which extend to the mean high water mark, is vested in the State in trust for the people. The public's right to use the tidal lands and water encompasses navigation, fishing and recreation-al uses, including bathing, swimming and other shore activities. *Borough of Neptune City v. Borough of Avon-by-the-Sea,* 61 *N.J.* 296, 309 (1972). In *Avon* we held that the public trust applied to the municipally-owned dry sand beach immediately landward of the high water mark.[1] The major issue in this case is whether, ancillary to the public's right to enjoy the tidal lands, the public has a right to gain access through and to use the dry sand area not owned by a municipality but by a quasi-public body.

The Borough of Point Pleasant instituted this suit against the Borough of Bay Head and the Bay Head Improvement Associa-tion (Association), generally asserting that the defendants pre-vented Point Pleasant inhabitants from gaining access to the Atlantic Ocean and the beachfront in Bay Head. The proceed-ing was dismissed as to the Borough of Bay Head because it did not own or control the beach. Subsequently, Virginia Mat-thews, a resident of Point Pleasant who desired to swim and bathe at the Bay Head beach, joined as a party plaintiff, and Stanley Van Ness, as Public Advocate, joined as plaintiff-inter-venor. When the Borough of Point Pleasant ceased pursuing the litigation, the Public Advocate became the primary moving party. The Public Advocate asserted that the defendants had denied the general public its right of access during the summer bathing season to public trust lands along the beaches in Bay

---

[1] The dry sand area is generally defined as the land that lies landward of the high water mark to the vegetation line or, where there is no vegetation to a seawall, road, parking lot or boardwalk. New Jersey Beach Access Study Commission, *Public Access to the Oceanfront Beaches: A Report to the Gover-nor and Legislature of New Jersey* 2 (1977).

Head and its right to use private property fronting on the ocean incidental to the public's right under the public trust doctrine. The complaint was amended on several occasions, eliminating the Borough of Point Pleasant as plaintiff and adding more than 100 individuals, who were owners or had interests in properties located on the oceanfront in Bay Head, as defendants.

Both sides moved for summary judgment. The trial court granted the defendants' motions except with respect to the plaintiff's claim that the public had acquired rights in the dry sand beach resulting from an implied dedication or prescriptive easement prior to 1932. When the plaintiff abandoned these claims, the trial court entered a final judgment in favor of the defendants. Upon plaintiff's appeal, the Appellate Division affirmed, one judge dissenting. Plaintiff appealed as of right, *R.* 2:2–1(a), and also filed a petition for certification, which we granted. 91 *N.J.* 559 (1982).

The facts as gleaned from the record consisting of depositions, answers to interrogatories, admissions [2] and the pleadings are substantially undisputed.

## I

### Facts

The Borough of Bay Head (Bay Head) borders the Atlantic Ocean. Adjacent to it on the north is the Borough of Point Pleasant Beach, on the south the Borough of Mantoloking, and on the west Barnegat Bay. Bay Head consists of a fairly narrow strip of land, 6,667 feet long (about 1¼ miles). A beach runs along its entire length adjacent to the Atlantic Ocean. There are 76 separate parcels of land that border the beach. All

---

[2] Individual defendants claim that a co-defendant's admissions may not be used against them on a summary judgment motion. We do not agree. For the purpose of the motion, admissions are similar to an affidavit of a person other than the party to the motion. We perceive of no reason why these admissions are not available for this purpose.

except six are owned by private individuals. Title to those six is vested in the Association.

The Association was founded in 1910 and incorporated as a nonprofit corporation in 1932. Its certificate of incorporation states that its purposes are

> the improving and beautifying of the Borough of Bay Head, New Jersey, cleaning, policing and otherwise making attractive and safe the bathing beaches in said Borough, and the doing of any act which may be found necessary or desirable for the greater convenience, comfort and enjoyment of the residents.

Its constitution delineates the Association's object to promote the best interests of the Borough and "in so doing to own property, operate bathing beaches, hire life guards, beach cleaners and policemen . . . . "

Nine streets in the Borough, which are perpendicular to the beach, end at the dry sand. The Association owns the land commencing at the end of seven of these streets for the width of each street and extending through the upper dry sand to the mean high water line, the beginning of the wet sand area or foreshore. In addition, the Association owns the fee in six shore front properties, three of which are contiguous and have a frontage aggregating 310 feet. Many owners of beachfront property executed and delivered to the Association leases of the upper dry sand area. These leases are revocable by either party to the lease on thirty days' notice. Some owners have not executed such leases and have not permitted the Association to use their beaches. Some also have acquired riparian grants from the State extending approximately 1,000 feet east of the high water line.

The Association controls and supervises its beach property between the third week in June and Labor Day. It engages about 40 employees, who serve as lifeguards, beach police and beach cleaners. Lifeguards, stationed at five operating beaches, indicate by use of flags whether the ocean condition is dangerous (red), requires caution (yellow), or is satisfactory (green). In addition to observing and, if need be, assisting those in the water, when called upon lifeguards render first aid. Beach

cleaners are engaged to rake and keep the beach clean of debris. Beach police are stationed at the entrances to the beaches where the public streets lead into the beach to ensure that only Association members or their guests enter. Some beach police patrol the beaches to enforce its membership rules.

Membership is generally limited to residents of Bay Head. Class A members are property owners. Class B are non-owners. Large families (six or more) pay $90 per year and small families pay $60 per year. Upon application residents are routinely accepted. Membership is evidenced by badges that signify permission to use the beaches. Members, which include local hotels, motels and inns, can also acquire badges for guests. The charge for each guest badge is $12. Members of the Bay Head Fire Company, Bay Head Borough employees, and teachers in the municipality's school system have been issued beach badges irrespective of residency.

Except for fishermen, who are permitted to walk through the upper dry sand area to the foreshore, only the membership may use the beach between 10:00 a.m. and 5:30 p.m. during the summer season. The public is permitted to use the Association's beach from 5:30 p.m. to 10:00 a.m. during the summer and, with no hourly restrictions, between Labor Day and mid-June.

No attempt has ever been made to stop anyone from occupying the terrain east of the high water mark. During certain parts of the day, when the tide is low, the foreshore could consist of about 50 feet of sand not being flowed by the water. The public could gain access to the foreshore by coming from the Borough of Point Pleasant Beach on the north or from the Borough of Mantoloking on the south.

Association membership totals between 4,800 to 5,000. The Association President testified during depositions that its restrictive policy, in existence since 1932, was due to limited parking facilities and to the overcrowding of the beaches. The Association's avowed purpose was to provide the beach for the residents of Bay Head.

There is also a public boardwalk, about one-third of a mile long, parallel to the ocean on the westerly side of the dry sand area. The boardwalk is owned and maintained by the municipality.

The trial court held that the Association was not an arm of the Borough of Bay Head, that the Association was not a municipal agency, and that nothing in the record justified a finding that public privileges could attach to the private properties owned or leased by the Association. A divided Appellate Division affirmed. The majority agreed with the trial court that the Association was not a public agency or a public entity and that the action of the private owners through the Association established no general right in the public to the use of the beaches.

Judge Greenberg dissented. He argued that the Association's beaches are de facto public to a limited extent, being public to residents and visitors who stay in hotels. They are private to everyone else. He reasoned that Bay Head residents have the advantage of living in a municipality with public beaches, but are not troubled by having their beaches made available to outsiders. Judge Greenberg concluded that the Association's beaches must be open to all members of the public. However, he would not preclude any lessor from terminating his lease with the Association and thereby eliminating the public right of access to that part of the beach.

## II

### The Public Trust

In *Borough of Neptune City v. Borough of Avon-by-the-Sea,* 61 *N.J.* 296, 303 (1972), Justice Hall alluded to the ancient principle "that land covered by tidal waters belonged to the sovereign, but for the common use of all the people." The genesis of this principle is found in Roman jurisprudence, which held that "[b]y the law of nature" "the air, running water, the sea, and consequently the shores of the sea" were "common to

mankind." Justinian, *Institutes* 2.1.1 (T. Sandars trans. 1st Am. ed. 1876). No one was forbidden access to the sea, and everyone could use the seashore [3] "to dry his nets there, and haul them from the sea . . . ." *Id.,* 2.1.5. The seashore was not private property, but "subject to the same law as the sea itself, and the sand or ground beneath it." *Id.* This underlying concept was applied in New Jersey in *Arnold v. Mundy,* 6 *N.J.L.* 1 (Sup.Ct. 1821).

The defendant in *Arnold* tested the plaintiff's claim of an exclusive right to harvest oysters by taking some oysters that the plaintiff had planted in beds in the Raritan River adjacent to his farm in Perth Amboy. The oyster beds extended about 150 feet below the ordinary low water mark. The tide ebbed and flowed over it. The defendant's motion for a nonsuit was granted. The Supreme Court denied the plaintiff's subsequent motion to set aside the nonsuit.

Chief Justice Kirkpatrick, in an extensive opinion, referred to the grant by Charles II of the land comprising New Jersey with "all rivers, harbors, waters, fishings, etc., and of all other royalties, so far as the king had estate, right, title or interest therein" to the Duke of York. 6 *N.J.L.* at 85 (2d ed. 1875) (emphasis deleted). The duke had been delegated the same power as the king with respect to the land, and by virtue of the charter could divide and grant only those properties and interests that the king could. The Chief Justice's analysis then turned to the power of the English king. According to English law, public property consisted of two classes. Some was necessary for the state's use, and the remainder was common property available to all citizens. Chief Justice Kirkpatrick wrote that "[o]f this latter kind, according to the writers upon the law of nature and of nations, and upon the civil law, are the air, the running water, the sea, the fish and the wild beasts." *Id.* at 86.

---

[3]The seashore extended to the limit of the highest winter flood, Justinian, *supra,* 2.1.3, and not the mean high water mark.

He argued that "though this title, strictly speaking, is in the sovereign, yet the use is common to all the people." *Id.* He pointed out the significant difference between public property necessary for the state and common property:

> The title of both these, for the greater order, and, perhaps, of necessity, is placed in the hands of the sovereign power, but it is placed there for different purposes. The citizen cannot enter upon the domain of the crown and apply it, or any part of it, to his immediate use. He cannot go into the king's forests and fall and carry away the trees, though it is the public property; it is placed in the hands of the king for a different purpose; it is the domain of the crown, a source of revenue; *so neither can the king intrude upon the common property, thus understood, and appropriate it to himself, or to the fiscal purposes of the nation, the enjoyment of it is a natural right which cannot be infringed or taken away, unless by arbitrary power;* and that, in theory at least, could not exist in a free government, such as England has always claimed to be. [*Id.* at 87–88 (emphasis supplied).]

The Chief Justice traced the use of common property by the kings and concluded that appropriation of common property by William the Conqueror and his successors was questionable and that the Magna Charta rectified the prior improper conduct by providing "*that where the banks of rivers had first been defended in his time,* (that is, when they had first been fenced in, and shut against the common use, in his time) *they should be from thenceforth laid open.*" *Id.* at 88. A charter of Henry III confirmed this principle at least to the extent that only grants of common property made before the reign of Henry II were valid. *Id.* at 89.[4]

---

[4]Chief Justice Taney in *Martin v. Waddell's Lessee,* 41 *U.S.* (16 Pet.) 367, 410, 10 *L.Ed.* 997, 1013 (1842), came to substantially the same conclusion that Chief Justice Kirkpatrick did, and wrote:

> The question is not free from doubt, and the authorities referred to in the English books cannot, perhaps, be altogether reconciled. But ... the question must be regarded as settled in England against the right of the king since Magna Charta to make such a grant [of a portion of the soil covered by navigable waters].

It is doubtful whether the sections of the Magna Charta upon which the Chief Justices relied support the proposition that the crown could not make grants involving the tidal waters. *See* Note, "The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine," 79 *Yale L.J.* 762 (1970).

Chief Justice Kirkpatrick concluded that all navigable rivers in which the tide ebbs and flows and the coasts of the sea, including the water and land under the water, are "common to all the citizens, and that each [citizen] has a right to use them according to his necessities, subject only to the laws which regulate that use . . . ." *Id.* at 93. Regulation included erecting docks, harbors and wharves, and improving fishery and oyster beds. This common property had passed from Charles II to the Duke of York. Upon surrender of all rights of government in 1702, the common property reverted to the Crown of England, and upon the Revolution these royal rights became vested in the people of New Jersey. *Id.* at 94. *See also* J. Angell, *A Treatise on the Right of Property in Tidewaters and in the Soil and Shores Thereof* 42–43 (2d ed. 1847); D. Ducsik, *Shoreline for the Public* 89–91 (1974). Later, in *Illinois Central R.R. v. Illinois,* 146 *U.S.* 387, 453, 13 *S.Ct.* 110, 118, 36 *L.Ed.* 1018, 1043 (1892), the Supreme Court, in referring to the common property, stated that "[t]he State can no more abdicate its trust over property in which the whole people are interested . . . than it can abdicate its police powers . . . ."[5]

---

[5]Despite the language in *Arnold v. Mundy,* there developed the notion that a shoreowner could obtain unrestricted ownership rights in the tidelands. *See Gough v. Bell,* 22 *N.J.L.* 441 (Sup.Ct.1850), aff'd, 23 *N.J.L.* 624 (E. & A. 1852); *see also Ross v. Mayor of Edgewater,* 115 *N.J.L.* 477, 485 (Sup.Ct. 1935), aff'd o.b., 116 *N.J.L.* 447 (E. & A.), *cert.* denied, 299 *U.S.* 543, 57 *S.Ct.* 37, 81 *L.Ed.* 420 (1936) (noting that owner of upland contiguous to the shore could appropriate the land between high and low water marks, provided he did not injuriously interfere with paramount right of navigation and that upon appropriation the owner had an "exclusive and indefeasible right of property"). This principle exists despite the fact that the State's title in tidelands cannot be lost by adverse possession or prescription. *O'Neill v. State Hwy. Dep't,* 50 *N.J.* 307, 320 (1967). The Legislature, at least up to the 1860's, granted corporate charters that included powers to occupy, possess and enjoy tide-flowed land. *See, e.g., L.* 1833, *p.* 92. In addition, the Legislature had from time to time made direct grants of riparian lands. No general supervision or control seems to have been exercised by the State until 1851, when the Legislature enacted the Wharf Act, which authorized counties to grant licenses to riparian owners to construct wharves in tidal waters. *L.* 1851, *p.* 335.

The Wharf Act was modified in 1869 to exclude the Hudson River, New York Bay and Kill Von Kull. *L.*1869, *c.* 383, § 3. It was repealed in 1891, and the Riparian Commission was authorized to sell riparian grants. *L.* 1891, *c.* 124, § 3; *N.J.S.A.* 12:3–4. The Commission's administration was extremely lax and it frequently sold or leased in perpetuity riparian rights for inadequate amounts. *See 1873 Report of the Riparian Commissioners* 5, which states that "[t]he Commissioners, in all cases, favor a liberal arrangement with shore owners, and deem that it is for the mutual interest and advantage of the riparian owners and of the State, to fix a valuation where the lands under tidal water along the whole frontage of the riparian owner are taken at one time, at such reasonable rates as will enable such owners, for a moderate sum which will not be burdensome, to acquire the ownership and control of such lands, and also secure an immediate return therefor to the State treasury." *See Report of the New Jersey Committee to Investigate Granting of Riparian Lands by the State, Etc.* (1907); *see also* Platt, "With Rivers and Harbors Unsurpassed: New Jersey and Her Tidelands, 1860–1870," 99 *N.J.Hist.* 145 (1981). One commentator states that decisional law post-*Arnold* acquiesced in legislative and private derogation of the common rights so that by 1973 the "legal and equitable tidalwater resource title had, practically, been squeezed from the citizenry." Jaffee, "The Public Trust Doctrine Is Alive and Kicking in New Jersey Tidalwaters: *Neptune City v. Avon-By-The Sea*—A Case of Happy Atavism?," 14 *Nat. Resources J.* 309, 310 (1974).

We are not unmindful of the principle that proceeds received by the State from the sale of property lying under water constitute a part of the permanent school fund. *N.J.S.A.* 18A:56–5, –6; *see N.J. Const.* (1947), Art. VIII, § IV, par. 2; *N.J. Const.* (1844), Art. IV, § VII, par. 6. The fact that compensation has been paid for grants and leases may not eliminate per se the public's right to some use of the common property for a public purpose. *Compare Schultz v. Wilson,* 44 *N.J.Super.* 591, 597 (App.Div.), certif. denied, 24 *N.J.* 546 (1957), which stated that "[t]he Legislature has the power, absolute and limited, to regulate, abridge or vacate public rights in tidal waters except in the field reserved to Congress by the Federal Constitution," *with Borough of Neptune City v. Borough of Avon-by-the-Sea,* 61 *N.J.* 296, 308 (1972), asserting that the Legislature may not have had unlimited power to convey trust lands or "at least that they are impliedly impressed with certain obligations on the grantee to use the conveyed lands only consistently with the public rights therein. For example, the conveyance of tide-flowed lands bordered by an ocean dry sand area in private ownership to the owner thereof may well be subject to the right of the public to use the ocean waters." *See also N.J. Sports & Exposition Authority v. McCrane,* 61 *N.J.* 1, 67–68 (Hall, J., concurring in part and dissenting in part) (stating that the public trust doctrine does not prohibit all alienation by the state of riparian lands, but that conveyances are subject to use by the public depending on the nature of the land), appeal dismissed *sub nom. Borough of East Rutherford v. N.J. Sports & Exposition Authority,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972). The leasing and granting of foreshore

▮ In *Avon*, Justice Hall reaffirmed the public's right to use the waterfront as announced in *Arnold v. Mundy*. He observed that the public has a right to use the land below the mean average high water mark [6] where the tide ebbs and flows. These uses have historically included navigation and fishing. In *Avon* the public's rights were extended "to recreational uses, including bathing, swimming and other shore activities." 61 *N.J.* at 309. *Compare Blundell v. Catterall,* 5 *B. & Ald.* 268, 106 *Eng.Rep.* 1190 (K.B.1821) (holding no right to swim in common property) *with Martin v. Waddell's Lessee,* 41 *U.S.* (16 Pet.) 367, 10 *L.Ed.* 997 (1842) (indicating right to bathe in navigable waters). The Florida Supreme Court has held:

> The constant enjoyment of this privilege [bathing in salt waters] of thus using the ocean and its fore-shore for ages without dispute should prove sufficient to establish it as an American common law right, similar to that of fishing in the sea, even if this right had not come down to us as a part of the English common law, which it undoubtedly has. [*White v. Hughes,* 139 *Fla.* 54, 59, 190 *So.* 446, 449 (1939).]

It has been said that "[h]ealth, recreation and sports are encompassed in and intimately related to the general welfare of a well-balanced state." *N.J. Sports & Exposition Authority v. McCrane,* 119 *N.J.Super.* 457, 488 (Law Div.1971), aff'd, 61 *N.J.* 1, appeal dismissed *sub nom. Borough of East Rutherford v. N.J. Sports & Exposition Authority,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972). Extension of the public trust doctrine to include bathing, swimming and other shore activities is consonant with and furthers the general welfare. The public's right to enjoy these privileges must be respected.

▮ In order to exercise these rights guaranteed by the public trust doctrine, the public must have access to municipally-owned

---

and ocean beach property by the state not inconsistent with the public interest are unquestionably valid.

[6]The high water mark is the "line formed by the intersection of the tidal plane of mean high tide with the shore." *O'Neill v. State Hwy. Dep't,* 50 *N.J.* 307, 323 (1967). The mean or ordinary high tide is a mean of all high tides over a period of 18.6 years. *Id.* at 324; *see also Borax Consolidated, Ltd. v. City of Los Angeles,* 296 *U.S.* 10, 26–27, 56 *S.Ct.* 23, 31, 80 *L.Ed.* 9, 20 (1935).

dry sand areas as well as the foreshore. The extension of the public trust doctrine to include municipally-owned dry sand areas was necessitated by our conclusion that enjoyment of rights in the foreshore is inseparable from use of dry sand beaches. *See Lusardi v. Curtis Point Property Owners Ass'n,* 86 *N.J.* 217, 228 (1981). In *Avon* we struck down a municipal ordinance that required nonresidents to pay a higher fee than residents for the use of the beach. We held that where a municipal beach is dedicated to public use, the public trust doctrine "dictates that the beach and the ocean waters must be open to all on equal terms and without preference and that any contrary state or municipal action is impermissible." 61 *N.J.* at 309. The Court was not relying on the legal theory of dedication, although dedication alone would have entitled the public to the full enjoyment of the dry sand. Instead the Court depended on the public trust doctrine, impliedly holding that full enjoyment of the foreshore necessitated some use of the upper sand, so that the latter came under the umbrella of the public trust.

In *Van Ness v. Borough of Deal,* 78 *N.J.* 174 (1978), we stated that the public's right to use municipally-owned beaches was not dependent upon the municipality's dedication of its beaches to use by the general public. The Borough of Deal had dedicated a portion of such beach for use by its residents only. We found such limited dedication "immaterial" given the public trust doctrine's requirement that the public be afforded the right to enjoy all dry sand beaches owned by a municipality. 78 *N.J.* at 179–80.

### III

### Public Rights in Privately-Owned Dry Sand Beaches

In *Avon* and *Deal* our finding of public rights in dry sand areas was specifically and appropriately limited to those beaches owned by a municipality. We now address the extent of the public's interest in privately-owned dry sand beaches. This interest may take one of two forms. First, the public may have

a right to cross privately owned dry sand beaches in order to gain access to the foreshore. Second, this interest may be of the sort enjoyed by the public in municipal beaches under *Avon* and *Deal,* namely, the right to sunbathe and generally enjoy recreational activities.

Beaches are a unique resource and are irreplaceable. The public demand for beaches has increased with the growth of population and improvement of transportation facilities. Furthermore, the projected demand for salt water swimming will not be met "unless the existing swimming capacities of the four coastal counties are expanded." Department of Environmental Protection, *Statewide Comprehensive Outdoor Recreation Plan* 200 (1977). The DEP estimates that, compared to 1976, the State's salt water swimming areas "must accommodate 764,812 more persons by 1985 and 1,021,112 persons by 1995." *Id. See also* Note, "Public Access to Beaches: Common Law Doctrines and Constitutional Challenges," 48 *N.Y.U.L.Rev.* 369 (1973). Sensitivity to the increased demand and limited supply was voiced by Justice Pashman in *Lusardi v. Curtis Point Property Owners Ass'n,* 86 *N.J.* 217, 227–28 (1981), when he wrote:

> Oceanfront property is uniquely suitable for bathing and other recreational activities. Because it is unique and highly in demand, there is growing concern about the reduced "availability to the public of its priceless beach areas," *Van Ness v. Borough of Deal,* 78 *N.J.* 174, 180 (1978). This concern is reflected in a statewide policy of encouraging, consonant with environmental demands, greater access to ocean beaches for recreational purposes. Expressions of this policy can be found in three sources: the decisions of this Court concerning the public trust doctrine, *Van Ness v. Borough of Deal, supra; Hyland v. Borough of Allenhurst,* 78 *N.J.* 190 (1978); *Borough of Neptune City v. Borough of Avon-by-the-Sea, supra,* legislation such as the Beaches and Harbors Bond Act of 1977, *L.*1977, *c.* 208, and the Coastal Resource and Development Policies promulgated by the Department of Environmental Protection, *N.J.A.C.* 7:7E–1.1 to –9.23.

█ Exercise of the public's right to swim and bathe below the mean high water mark may depend upon a right to pass across the upland beach. Without some means of access the public right to use the foreshore would be meaningless. To say that the public trust doctrine entitles the public to swim in the ocean and to use the foreshore in connection therewith without

assuring the public of a feasible access route would seriously impinge on, if not effectively eliminate, the rights of the public trust doctrine. This does not mean the public has an unrestricted right to cross at will over any and all property bordering on the common property. The public interest is satisfied so long as there is reasonable access to the sea.

Judge Best, in his dissent in *Blundell v. Catterall,* 5 *B. & Ald.* 268, 275, 106 *Eng.Rep.* 1190, 1193 (K.B.1821), stated that passage to the seashore was essential to the exercise of that right. He believed that bathing in the tidal waters was an essential right similar to that of navigation and served the general welfare by promoting health and the ability to swim. 5 *B. & Ald.* at 278–79, 106 *Eng.Rep.* at 1194 (Best, J., dissenting). Though respecting the interest of the private owner, Judge Best observed that the greatest part of the seashore had been barren and therefore had not become exclusive property. "It is useful only as a boundary and an approach to the sea; and therefore, ever has been, and ever should continue common to all who have occasion to resort to the sea." *Id.* at 283–84; 106 *Eng.Rep.* at 1196. Judge Best would have held on principles of public policy "that the interruption of free access to the sea is a public nuisance. . . . The principle of exclusive appropriation must not be carried beyond things capable of improvement by the industry of man. If it be extended so far as to touch the right of walking over these barren sands, it will take from the people what is essential to their welfare, whilst it will give to individuals only the hateful privilege of vexing their neighbours." *Id.* at 287, 106 *Eng.Rep.* at 1197.

The touchstone of Judge Best's reasoning is that the particular circumstances must be considered and examined before arriving at a solution that will accommodate the public's right and the private interests involved. Thus an undeveloped segment of the shore may have been available and used for access so as to establish a public right of way to the wet sand. Or there may be publicly-owned property, such as in *Avon,* which is suitable. Or, as in this case, the public streets and adjacent upland sand

area might serve as a proper means of entry. The test is whether those means are reasonably satisfactory so that the public's right to use the beachfront can be satisfied.

The bather's right in the upland sands is not limited to passage. Reasonable enjoyment of the foreshore and the sea cannot be realized unless some enjoyment of the dry sand area is also allowed.[7] The complete pleasure of swimming must be accompanied by intermittent periods of rest and relaxation beyond the water's edge. *See State ex rel. Thornton v. Hay,* 254 *Or.* 584, 599–602, 462 *P.2d* 671, 678–79 (1969) (Denecke, J., concurring). The unavailability of the physical situs for such rest and relaxation would seriously curtail and in many situations eliminate the right to the recreational use of the ocean. This was a principal reason why in *Avon* and *Deal* we held that municipally-owned dry sand beaches "must be open to all on equal terms . . . ." *Avon,* 61 *N.J.* at 308. We see no reason why rights under the public trust doctrine to use of the upland dry sand area should be limited to municipally-owned property. It is true that the private owner's interest in the upland dry sand area is not identical to that of a municipality. Nonetheless, where use of dry sand is essential or reasonably necessary for enjoyment of the ocean, the doctrine warrants the public's use of the upland dry sand area subject to an accommodation of the interests of the owner.[8]

We perceive no need to attempt to apply notions of prescription, *City of Daytona Beach v. Tona-Rama, Inc.,* 294 *So.2d* 73

---

[7]Some historical support for this proposition may be found in an analogous situation where fishermen, in exercising the right of public fishery in tidal waters, were permitted to draw nets on the beach above the ordinary high water mark in the act of fishing. S. Moore & H. Moore, *The History and Law of Fisheries* 96 (1903).

[8]The Coastal Resource and Development Policies of the Department of Environmental Protection espouse a similar goal. *N.J.A.C.* 7:7E–3.21(c) states: "Unrestricted access [to the beaches, the area landward from the mean high water line] for recreational purposes is desirable so that the beaches can be enjoyed by all residents and visitors of the state."

(Fla.1974), dedication, *Gion v. City of Santa Cruz*, 2 *Cal.3d* 29, 465 *P.2d* 50, 84 *Cal.Rptr.* 162 (1970), or custom, *State ex rel. Thornton v. Hay*, 254 *Or.* 584, 462 *P.2d* 671 (1969), as an alternative to application of the public trust doctrine. Archaic judicial responses are not an answer to a modern social problem. Rather, we perceive the public trust doctrine not to be "fixed or static," but one to "be molded and extended to meet changing conditions and needs of the public it was created to benefit." *Avon*, 61 *N.J.* at 309.

■ Precisely what privately-owned upland sand area will be available and required to satisfy the public's rights under the public trust doctrine will depend on the circumstances. Location of the dry sand area in relation to the foreshore, extent and availability of publicly-owned upland sand area, nature and extent of the public demand, and usage of the upland sand land by the owner are all factors to be weighed and considered in fixing the contours of the usage of the upper sand.

■ Today, recognizing the increasing demand for our State's beaches and the dynamic nature of the public trust doctrine, we find that the public must be given both access to and use of privately-owned dry sand areas as reasonably necessary. While the public's rights in private beaches are not co-extensive with the rights enjoyed in municipal beaches, private landowners may not in all instances prevent the public from exercising its rights under the public trust doctrine. The public must be afforded reasonable access to the foreshore as well as a suitable area for recreation on the dry sand.

V

The Beaches of Bay Head

The Bay Head Improvement Association, which services the needs of all residents of the Borough for swimming and bathing in the public trust property, owns the street-wide strip of dry sand area at the foot of seven public streets that extends to the

mean high water line. It also owns the fee in six other upland sand properties connected or adjacent to the tracts it owns at the end of two streets. In addition, it holds leases to approximately 42 tracts of upland sand area. The question that we must address is whether the dry sand area that the Association owns or leases should be open to the public to satisfy the public's rights under the public trust doctrine. Our analysis turns upon whether the Association may restrict its membership to Bay Head residents and thereby preclude public use of the dry sand area.

The general rule is that courts will not compel admission to a voluntary association. *See Rutledge v. Gulian,* 93 *N.J.* 113, 118 (1983); *Higgins v. American Society of Clinical Pathologists,* 51 *N.J.* 191, 199 (1968). Ordinarily, a society or association may set its own membership qualifications and restrictions. However, that is not an inexorable rule. Where an organization is quasi-public, its power to exclude must be reasonably and lawfully exercised in furtherance of the public welfare related to its public characteristics. *See Guerrero v. Burlington Cty. Memorial Hospital,* 70 *N.J.* 344, 358 (1976).

In *Greisman v. Newcomb Hospital,* 40 *N.J.* 389 (1963), plaintiff, holder of a degree of osteopathy and licensed to practice medicine and surgery, sought to be admitted to the courtesy staff of the defendant hospital. The defendant hospital refused to permit the plaintiff to file an application. The defendant contended that it was a private hospital and that its actions were not reviewable by a court. Justice Jacobs, writing for the Court, responded:

> They are private in the sense that they are nongovernmental but they are hardly private in other senses. Newcomb [Hospital] is a nonprofit organization dedicated by its certificate of incorporation to the vital public use of serving the sick and injured, its funds are in good measure received from public sources and through public solicitation, and its tax benefits are received because of its nonprofit and non-private aspects. *Cf. Fairmount Hospital, Inc. v. State Board of Tax Appeals,* 122 *N.J.L.* 8, 11 (Sup.Ct.1939), aff'd 123 *N.J.L.* 201 (E. & A.1939). It constitutes a virtual monopoly in the area in which it functions and it is in no position to claim immunity from public supervision and control because of its

allegedly private nature. Indeed, in the development of the law, activities much less public than the hospital activities of Newcomb, have commonly been subjected to judicial (as well as legislative) supervision and control to the extent necessary to satisfy the felt needs of the times. [40 *N.J.* at 396.]

In considering the public interest, Justice Jacobs noted that the defendant hospital was the only available hospital where the plaintiff practiced and that the hospital was operated not for private ends but for the benefit of the public. Justice Jacobs concluded that "courts would indeed be remiss if they declined to intervene where . . . the [hospital's] powers were invoked at the threshold to preclude an application for staff membership, not because of any lack of individual merit, but for a reason unrelated to sound hospital standards and not in furtherance of the common good." *Id.* at 404.

In *Falcone v. Middlesex Cty. Medical Society,* 34 *N.J.* 582 (1961), plaintiff, a doctor of osteopathy licensed to practice medicine and surgery, was refused membership in the defendant County Medical Society. The effect of the refusal was that the plaintiff could not obtain staff privileges at any hospital in the area. Recognizing the judiciary's reluctance to interfere with the internal affairs of membership associations, the Court stated that it would do so "in particular situations, where considerations of policy and justice were sufficiently compelling. . . ." *Id.* at 590. Noting that the Medical Society was not simply a social organization, the Court viewed membership as an economic necessity and asserted that courts "must be particularly alert to the need for truly protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity for earning a livelihood while not impairing the proper standards and objectives of the organization." *Id.* at 592.

A principle that may be distilled from *Greisman* and *Falcone* is that a nonprofit association that is authorized and endeavors to carry out a purpose serving the general welfare of the community and is a quasi-public institution holds in trust its powers of exclusive control in the areas of vital public concern.

*See also Marjorie Webster Jr. College v. Middle States Ass'n of Colleges and Secondary Schools, Inc.,* 302 *F.Supp.* 459, 469 (D.D.C.1969) (stating that court may be forced to intervene in affairs of a voluntary association where the association "enjoys monopoly power in an area of vital public concern"), rev'd on other grounds, 432 *F.2d* 650 (D.C.Cir.), *cert.* denied, 400 *U.S.* 965, 91 *S.Ct.* 367, 27 *L.Ed.2d* 384 (1970). When a nonprofit association rejects a membership application for reasons unrelated to its purposes and contrary to the general welfare, courts have "broad judicial authority to insure that exclusionary policies are lawful and are not applied arbitrarily or discriminately." *Greisman,* 40 *N.J.* at 395; *see also Oates v. Eastern Bergen County Multiple Listing Service, Inc.,* 113 *N.J.Super.* 371, 387–89 (Ch. Div.1971); *Davis v. Morristown Memorial Hospital,* 106 *N.J.Super.* 33, 42 (Ch.Div.1969). That is the situation here.

Bay Head Improvement Association is a non-profit corporation whose primary purpose as stated in its certificate of incorporation is the "cleaning, policing and otherwise making attractive and safe the bathing beaches" in the Borough of Bay Head "and the doing of any act which may be found necessary or desirable for the greater convenience, comfort and enjoyment of the residents." Its constitution states:

> The objects of this corporation shall be to promote the best interests of the Borough of Bay Head and in so doing to own property, operate bathing beaches, hire life guards, beach cleaners and policemen and do any and all things which, in the judgment of their Executive Committee, may be in the best interests of the Borough of Bay Head....

Shortly after the Association was incorporated and had established a plan to operate beaches that would be open to all residents of Bay Head, the Bay Head Borough Council, after discussion with the Association's members, adopted resolutions approving the plan and agreeing to cooperate with the Association in carrying out this plan "insofar as it lies within the power of the Council so to do." The municipality evidenced its cooperation thereafter in a number of ways. It provided office space without charge in the Borough Hall between 1934 and 1973. Until 1975 seven parcels that ran from public streets to the

mean high tide, all owned by the Association, were not assessed and the Association paid no realty taxes for those properties. The Borough's blanket liability insurance policies in effect between 1962 and 1968 covered the Association's activities on the beach area. The Borough appropriated public funds for the Association's benefit, $600 annually between 1936 and 1941, and $1,000 in 1969. Six groins (stone jetties) have been installed on the beach. The Borough paid one quarter of their cost; Ocean County, one quarter; and the State, one half.

The Association's activities paralleled those of a municipality in its operation of the beachfront. The size of the beach was so great that it stationed lifeguards at five separate locations. The beach serviced about 5,000 members. The lifeguards performed the functions characteristic of those on a public beach. They posted warnings with respect to the safety of swimming. They stood ready to render assistance to anyone in need of aid. These guards were available daily throughout the summer months. The beach was maintained and kept clean by crews who worked each day. These crews cleaned the beach from end to end, including properties not leased to the Association. Membership badges were sold and guards were stationed at entrances to the beach to make certain that only those licensed could gain admittance. Further, some guards patrolled the beach to make certain that members and guests complied with the Association's rules and regulations. When viewed in its totality—its purposes, relationship with the municipality, communal characteristic, activities, and virtual monopoly over the Bay Head beachfront—the quasi-public nature of the Association is apparent. The Association makes available to the Bay Head public access to the common tidal property for swimming and bathing and to the upland dry sand area for use incidental thereto, preserving the residents' interests in a fashion similar to *Avon.*[9]

---

[9]There are nine public streets, which run in an east-west direction, that terminate at the upper dry sands of the oceanfront. With respect to seven of

■ There is no public beach in the Borough of Bay Head. If the residents of every municipality bordering the Jersey shore were to adopt the Bay Head policy, the public would be prevented from exercising its right to enjoy the foreshore. The Bay Head residents may not frustrate the public's right in this manner.[10] By limiting membership only to residents and foreclosing the public, the Association is acting in conflict with the public good and contrary to the strong public policy "in favor of encouraging and expanding public access to and use of shoreline areas." *Gion v. City of Santa Cruz*, 2 *Cal*.3d 29, 43, 465 *P*.2d 50,

these streets, the Association owns the strip of dry sand stretching from the ends of these streets to the wet sands, where the public has a right to bathe and swim. The Association acquired those properties to enable all Bay Head residents to enjoy the public's common interest in the beach—both swimming and bathing in the water and incidental uses in the dry sand adjacent thereto. The municipality extended its public streets, which run in an east-west direction, into the upper dry sand area in order to give the public a means of access to the beach. That this was its probable intent becomes apparent when noting the location of the terminals of these streets. The east-west streets run beyond East Avenue, which runs parallel to the ocean and is the most easterly highway running north-south in the Borough, to the upland sands. The land beyond is barren. The only apparent purpose in extending these streets to the upper sands was to provide a means of ingress to and egress from the beach.

Because of our holding herein, we need not decide whether the public streets may be deemed to extend to the foreshore or whether the public's right of way from the public streets to the foreshore exists because of an easement by necessity, dedication, or prescription. It has been contended that "trespass actions will not lie against New Jersey citizens who, without injuring improvements, traverse upland beach abutting a public road or street to reach foreshore." Jaffee, *supra* n. 4, at 316. *See Mayor of Jersey City v. Morris Canal and Banking Co.*, 12 *N.J.Eq.* 545 (E. & A. 1859) (holding that public was entitled to an extension of the street to tide water over land filled in by shore owner in front of terminus of the street as if land filled in were an alluvion).

[10]According to a report of the New Jersey Beach Access Study Commission, *supra* n. 1, at 21–22, app. 5, only four of the forty-eight municipalities have no publicly-owned dry beach.

59, 84 *Cal.Rptr.* 162, 171 (1970). Indeed, the Association is frustrating the public's right under the public trust doctrine. It should not be permitted to do so.

Accordingly, membership in the Association must be open to the public at large. In this manner the public will be assured access to the common beach property during the hours of 10:00 a.m. to 5:30 p.m. between mid-June and September, where they may exercise their right to swim and bathe and to use the Association's dry sand area incidental to those activities. Although such membership rights to the use of the beach may be broader than the rights necessary for enjoyment of the public trust, opening the Association's membership to all, nonresidents and residents, should lead to a substantial satisfaction of the public trust doctrine. However, the Association shall also make available a reasonable quantity of daily as well as seasonal badges to the nonresident public. Its decision with respect to the number of daily and seasonal badges to be afforded to nonresidents should take into account all relevant matters, such as the public demand and the number of bathers and swimmers that may be safely and reasonably accommodated on the Association's property, whether owned or leased. The Association may continue to charge reasonable fees to cover its costs of lifeguards, beach cleaners, patrols, equipment, insurance, and administrative expenses. The fees fixed may not discriminate in any respect between residents and nonresidents. The Association may continue to enforce its regulations regarding cleanliness, safety, and other reasonable measures concerning the public use of the beach. In this connection, it would be entirely appropriate, in the formulation and adoption of such reasonable regulations concerning the public's use of the beaches, to encourage the participation and cooperation of all private beachfront property owners, regardless of their membership in or affiliation with the Association.

The Public Advocate has urged that all the privately-owned beachfront property likewise must be opened to the public. Nothing has been developed on this record to justify that conclusion. We have decided that the Association's membership and thereby its beach must be open to the public. That area might reasonably satisfy the public need at this time. We are aware that the Association possessed, as of the initiation of this litigation, about 42 upland sand lots under leases revocable on 30 days' notice. If any of these leases have been or are to be terminated, or if the Association were to sell all or part of its property, it may necessitate further adjudication of the public's claims in favor of the public trust on part or all of these or other privately-owned upland dry sand lands depending upon the circumstances. However, we see no necessity to have those issues resolved judicially at this time since the beach under the Association's control will be open to the public and may be adequate to satisfy the public trust interests. We believe that the Association and property owners will act in good faith and to the satisfaction of the Public Advocate. Indeed, we are of the opinion that all parties will benefit by our terminating this prolonged litigation at this time.

The record in this case makes it clear that a right of access to the beach is available over the quasi-public lands owned by the Association, as well as the right to use the Association's upland dry sand. It is not necessary for us to determine under what circumstances and to what extent there will be a need to use the dry sand of private owners who either now or in the future may have no leases with the Association. Resolution of the competing interests, private ownership and the public trust, may in some cases be simple, but in many it may be most complex. In any event, resolution would depend upon the specific facts in controversy.

None of the foregoing matters were fully argued or briefed, the disputes concerning rights in and to private beaches having been most general. All we decide here is that private

land is not immune from a possible right of access to the foreshore for swimming or bathing purposes, nor is it immune from the possibility that some of the dry sand may be used by the public incidental to the right of bathing and swimming.

We realize that considerable uncertainty will continue to surround the question of the public's right to cross private land and to use a portion of the dry sand as discussed above. Where the parties are unable to agree as to the application of the principles enunciated herein, the claim of the private owner shall be honored until the contrary is established.

The modifications in the membership and daily badge practice we have decided upon here shall be made effective for the next summer season commencing June 1, 1984.

The judgment of the Appellate Division is reversed in part and affirmed in part. Judgment is entered for the plaintiff against the Association. Judgment of dismissal against the individual property owners is affirmed without prejudice. No costs.

*For reversal in part; affirmance in part*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*Opposed*—None.