STANLEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, AND ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. BOROUGH OF DEAL, *ET AL*, DEFENDANTS-APPELLANTS.

Argued June 13, 1978—Decided October 16, 1978.

*Mr. Robert P. Corman,* Assistant Deputy Public Advocate, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Advocate of the State of New Jersey, attorney).

*Mr. Stephen Skillman,* Assistant Attorney General argued the cause for respondent Attorney General of the State of New Jersey (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Michael S. Bokar,* Deputy Attorney General, on the brief).

*Mr. Thomas L. Morrissey* argued the cause for respondents Borough of Deal *et al.* (*Messrs. Carpenter, Bennett & Morrissey,* attorneys; *Mr. Michael S. Waters* and *Mr. Rudy B. Coleman,* on the brief).

The opinion of the court was delivered by

SULLIVAN, J. The underlying suit was brought by Stanley C. Van Ness, Public Advocate of the State of New Jersey, against the Borough of Deal charging the Borough with illegal and discriminatory practices in the maintenance and operation of its publicly owned beaches and related facilities. The suit was bottomed on this Court's 1972 decision in *Bor. of Neptune v. Bor. of Avon-by-the-Sea,* 61 *N. J.* 296, which held that a coastline municipality, in the maintenance and operation of its public beaches, could not discriminate in any respect between residents and nonresidents.

Deal is a municipality in Monmouth County bordering on the Atlantic Ocean for its entire one-mile eastern boundary. Only about 1325 feet of that coastline is suitable for beach and bathing purposes. This area is municipally owned and is divided into three sections. The north beach is called the

Phillips Avenue Pavilion Beach and extends for some 475 feet along the ocean. It has bathhouses, rest rooms, a play area and sun deck. The facilities are available on a daily or seasonal basis at fixed charges which are constant for residents as well as nonresidents.[1] This beach area has been dedicated by the municipality to general public use.

Just to the south of the Pavilion area is the Deal Casino, also municipally owned, but operated on a restricted basis. The Casino has two swimming pools, a snack bar-restaurant, rest rooms, bathhouses and deluxe cabanas, as well as facilities for shuffleboard, ping-pong, basketball and the like. Only Deal residents or property owners can obtain membership in the Casino.

The beach area in front of the Casino, which extends approximately 420 feet along the ocean, is dedicated for the use of residents of Deal and, except for a 50-foot wide strip along the high water line, is reserved for the use of Casino members and guests. Prior to construction of the Casino in 1956, this area consisted of a bluff about 20–30 feet high which was unsuitable as a bathing beach. As a part of the Casino project, the bluff was bulldozed and graded to form a dry beach area. Approximately $800,000 was spent by Deal to construct the Casino and beach. Maintenance expenses are paid out of the membership fees.

There is no restriction on the right of the public to bathe and swim in the ocean in front of the Casino. The public is also allowed to use a 50-foot wide strip of the Casino's dry beach area extending along the high water mark. However, commencing about 50 feet west of the high water mark, the dry sand area in front of the Casino is roped off and reserved for the use of Casino members.

---

[1]Pavilion charges originally were higher for nonresidents than for residents. This was one of the discriminatory practices which the Public Advocate challenged. The trial judge ruled that the charges had to be the same for both residents and nonresidents. The Borough, accordingly, has amended its ordinance to equalize these charges and the matter is no longer an issue in the case.

To the south of the Casino is the municipally owned surfing and boating beach approximately 430 feet in width. This area is used by bathers from both the Pavilion and the Casino, as well as by the general public.

The original suit had as its object the opening to the public of the Casino memberships and facilities, as well as the restricted dry beach area in front of the Casino. It was asserted that these facilities came under the Public Trust Doctrine as applied by this Court in *Avon*. The trial judge, in an opinion reported at 139 *N. J. Super.* 83 (Ch. Div. 1975), sustained the proposition that these municipally owned facilities, including the beach area, must be made available to nonresidents of Deal on the same basis as to residents. However, the specific relief ordered,[2] was not rested on the Public Trust Doctrine but, rather, based on the concept of municipal power and the requirement of equal protection.

The Appellate Division reversed. Its opinion is reported at 145 *N. J. Super.* 368 (1976). As to the Casino, it held that limiting membership in the Casino to residents of Deal did not deny equal protection since the classification was reasonable under the circumstances. It found in *N. J. S. A.* 40 :61–22.21, the statute empowering a municipality to build and operate a swimming pool facility, authorization to establish membership qualifications as long as they were reasonable.

It also held that the beach in front of the Casino was not subject to our holding in *Avon* as it had not been dedicated to the general public's use and, since the remaining beach area made available for the use of the general public was adequate for the enjoyment of public trust rights, the Appellate Division sustained the power of the municipality to

[2]The trial judge ordered that the Casino facilities and beach be opened to nonresidents as well as residents, and memberships allocated among the applicants on a lottery basis. He also required the Casino, up to a safe limit of people, to provide for daily rates and admissions to Casino facilities.

restrict use of the Casino beach to Casino membership. This Court granted certification on application by the Public Advocate. 74 *N. J.* 262 (1977).

At the argument of the appeal before this Court, the Public Advocate abandoned that part of the case which claimed that the Casino facilities were subject to the Public Trust Doctrine and must be opened to the public. His sole contention now is that the dry beach area immediately in front of the Casino is subject to the doctrine and should be available to the general public so that there may be a proper enjoyment of public trust rights. This is the only issue before us.

In *Bor. of Neptune v. Bor. of Avon-by-the-Sea, supra,* as heretofore noted, we held that an oceanside municipality, in the maintenance and operation of its public beaches, could not discriminate in any respect between residents and non-residents. There involved was Avon's asserted right to charge nonresidents higher fees than residents for the use of its public beach. Our ruling was bottomed on an expanded application of the Public Trust Doctrine, the original purpose of which was to preserve for all the public natural water resources for navigation and fishing. In *Avon, supra,* 61 *N. J.* at 303–310, there is discussed in some detail the origins of the doctrine, its history, development and modern connotations, citing numerous authoritative articles and critiques.

The Public Trust Doctrine has always been recognized in New Jersey. It is deeply engrained in our common law, *Arnold v. Mundy,* 6 *N. J. L.* 1 (Sup. Ct. 1821), due, no doubt, to New Jersey's unique location on the Atlantic Ocean, Delaware and New York Bays with numerous rivers and tributaries emptying into these bodies, resulting in extensive shorelines and considerable tidal waters and tidal lands in the State. New Jersey beaches adjacent to its tidal areas are world famous because of their suitability for bathing, surf fishing and other forms of recreation.

In *Avon,* this Court had no difficulty in finding that in this day and age the public rights in tidal lands were not

limited to the ancient prerogatives of fishing and navigation, but extended as well to recreational uses including bathing, swimming and other shore activities. 61 *N. J.* at 309. In so holding, we noted that the Public Trust Doctrine, like all common law principles, was not fixed or static, but should be molded and extended to meet changing conditions and the needs of the public the doctrine was created to benefit. *Id.*

With regard to municipally owned beaches, we said this:

> * * * at least where the upland sand area is owned by a municipality — a political subdivision and creature of the state — and dedicated to public beach purposes, a modern court must take the view that the public trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference and that any contrary state or municipal action is impermissible.
>
> *Id.* at 308–309.

This ruling is fully applicable to the present appeal. In *Avon,* contrary to defendants' contention herein, we were not limiting our ruling to the beach area between low and high water — the wet beach area. We said and we meant that, in New Jersey, a proper application of the Public Trust Doctrine requires that the municipally owned upland sand area adjacent to the tidal waters must be open to all on equal terms and without preference. See Note, 26 *Rutgers L. Rev.* 179, 181 (1972). Of course, the municipality, in the exercise of its police power and in the interest of the public health and safety, would have the right to adopt reasonable regulations as to the use and enjoyment of the beach area.

Our ruling here, as in *Avon,* is concerned with municipally owned open beaches. We are not called upon to deal with beaches on which permanent improvements may have been built, or beaches as to which a claim of private ownership is asserted.

The fact that Deal has never dedicated the Casino beach to the use of the general public is immaterial. The beach is dedicated to recreational uses including bathing, swimming, surf fishing and other shore activities. If the area,

which is under municipal ownership and dedication, is subject to the Public Trust Doctrine, and we hold that it is, all have the right to use and enjoy it. Deal cannot frustrate the public right by limiting its dedication of use to residents of Deal. Nor may it allocate to the public on a limited basis, rights which, under the doctrine, the public inherently has in full.

Nor do we think it significant that the area in front of the Casino in its natural state, was unsuitable for normal beach activities and that a bluff had to be levelled and graded in order to create a beach area. Whether natural, or man-made, the beach is an adjunct to ocean swimming and bathing and is subject to the Public Trust Doctrine.

Our ruling herein is intended to encompass normal beach areas. We are not presented with special circumstances such as an unusually large dry beach which might call for a modified application of our ruling herein.

The dissent herein, expressing uncertainty as to the extent of the Public Trust Doctrine, would not, at this time, hold that it applied to municipally owned dry sand beaches. However, this State is rapidly approaching a crisis as to the availability to the public of its priceless beach areas. The situation will not be helped by restrained judicial pronouncements. Prompt and decisive action by the Court is needed.

The dissent also expresses concern that in *Avon* the Court appeared to deny the Legislature power to alter the status of property impressed with the public trust. *Avon,* by way of dictum, does say that "state * * * action," which is contrary to the concept that beach and ocean waters must be open to all on equal terms, "is impermissible," 61 *N. J.* at 309, and that statements in New Jersey cases of an unlimited power in the Legislature to convey such trust lands to private persons "may well be too broad." 61 *N. J.* at 308. This proposition, the dissent asserts, would place public trust property beyond legislative control and regulation, and cast doubt upon the validity of titles to public trust lands which

have been or may hereafter be conveyed by the State. We agree that the question is troublesome, but it is not involved in the present case and we leave a more definite resolution of it to specific facts and circumstances where it can be dealt with directly.

The last ground of dissent suggests that the inclusion of municipally owned dry sand beaches within the Public Trust Doctrine — making them at once indiscriminately available to all members of the public — constitutes a taking for which the municipality would be entitled to compensation from the State. No such claim is made herein by Deal, nor has the issue been briefed or argued. We, therefore, hold the question for a more appropriate case. However, our adjudication that the Deal municipal dry sand beach is subject to the Public Trust Doctrine does not create a public right where none existed previously. It merely gives recognition to the existence of such right. To say that this adjudication constitutes a compensable taking is questionable at best.

In summary, we hold that the municipally owned beach in front of the Deal Casino must be opened to the general public on the same basis as the Pavilion beach.[3] That portion of the Appellate Division judgment which approved and sanctioned the municipal restriction on the use of the Casino beach to Casino members is reversed.

MOUNTAIN, J., dissenting. I dissent from the majority opinion and would affirm the judgment of the Appellate Division substantially for the reasons given by Judge Morgan in her opinion reported at 145 *N. J. Super.* 368 (1976).

The majority today follows the opinion of this Court in *Borough of Neptune v. Borough of Avon-by-the-Sea,* 61 *N. J.*

---

[3]The Public Advocate represents that there is adequate public access to the Casino beach from the Pavilion beach immediately to the north and the surfing and boating beach immediately to the south, and that direct access through the Casino itself is unnecessary.

296 (1972), (*Avon*), and elaborates somewhat upon that holding. It is now unmistakably clear that all municipally owned beaches from Sandy Hook to Cape May are open to all members of the public on equal terms. This result is reached by judicially declaring that the public trust doctrine applies to these upland expanses of dry sand. The implications and ramifications of this ruling require more careful attention than they have received.

## I

I submit that in New Jersey today there is a continuing and pervasive uncertainty as to just what the public trust doctrine is and to what properties it applies. Of these uncertainties, one of the most significant has to do with the question of legislative supervision and control. Until the scope of the public trust doctrine is clarified, it would certainly be the part of wisdom to refrain from incorporating within this doctrine the many miles of valuable beach on the Atlantic Ocean that are owned by our municipalities.

In *Avon*, the Court appeared to deny the Legislature power to alter the status of property impressed with the public trust:

> The observation to be made is that the statements in our cases of an unlimited power in the legislature to convey such trust lands to private persons may well be too broad. It may be that some such prior conveyances constituted an improper alienation of trust property or at least that they are impliedly impressed with certain obligations on the grantee to use the conveyed lands only consistently with the public rights therein. [61 *N. J.* at 308][1]

The Court in *Avon* characterized this statement as *dictum,* but what follows is surely a holding in the case:

> We mention this alienation aspect to indicate that, at least where the upland sand area is owned by a municipality — a political sub-

---

[1]This proposition casts doubt upon the validity of titles in public trust lands which have been or may hereafter be conveyed by the state.

division and creature of the state — and dedicated to public beach purposes, a modern court must take the view that the public trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference *and that any contrary state or municipal action is impermissible.* [61 *N. J.* at 308–309; emphasis added]

Observe that "any . . . contrary state . . . action is impermissible." This must mean that *legislative* action is impermissible.

One well qualified commentator, concluding his study of the public trust doctrine in New Jersey after *Avon,* has this to say:

*Neptune City* [*Avon*] apparently announces recognition by the Supreme Court of New Jersey that its 1821 decision in *Arnold v. Mundy* established an inalienable, indefeasible equitable property in the citizens of New Jersey respecting the state's tidalwater resources. This interest, whose legal title is held in trust for the public by the legislature, seems to be cognizable at the suit of individual citizens *qua* citizens. Expansive or protean, though principally related to navigation, fishing and attendant interests, the public trust is defined by actual citizenry demand. Thus, presently the trust comprehends the rights of sea-bathing and foreshore and tidelands recreation, and precludes discrimination in its regulation. *This public trust also appears to be beyond legislative prerogative.* Citizens accordingly would seem entitled to judicial review of legislative allocations of tidalwater resources, review even of relevant legislative findings and policies. [Jaffee, "The Public Trust Doctrine is Alive and Kicking in New Jersey Tidalwater: Neptune City v. Avon-by-the-Sea —A Case of Happy Atavism?," 14 *Natural Resources J.* 309, 334–5 (1974) ; emphasis added]

Is this a correct description of New Jersey law as it is today? There is support for every statement made, and yet I, for one, am far from sure. Such a rule, purporting to place public trust property beyond legislative reach, is substantially at variance with every decision on the subject handed down in this State during the 150 years separating *Arnold v. Mundy,* 6 *N. J. L.* 1 (Sup. Ct. 1821) from *Avon.*[2]

[2]The cases are examined and critically analyzed in Jaffee, "State Citizen Rights Respecting Greatwater Resource Allocation: From Rome to New Jersey," 25 *Rutgers L. Rev.* 571, 649–710 (1971).

In discussing the power of the Legislature to regulate and control lands subject to the public trust doctrine, Judge Goldmann, as recently as 1957, observed,

The Legislature has the power, absolute and unlimited, to regulate, abridge or vacate public rights in tidal waters except in the field reserved to Congress by the Federal Constitution. [*Schultz v. Wilson*, 44 *N. J. Super.* 591, 597 (App. Div. 1957)]

The statement is followed by the citation of a number of cases squarely supporting this position. Of course, if such powers exist with respect to tidal waters, which have been subject to the public trust doctrine for hundreds of years, they must surely exist with respect to upland beaches that have only recently become part of the public trust lands.

Just why the Legislature should be forbidden to control and regulate public trust properties is by no means clear. All admit that the public trust doctrine came to North America from Great Britain apparently as part of the common law. But in England the status of public trust properties could be freely altered by Parliament.

It was never doubted that an act of Parliament would operate to extinguish any public right of passage, whether by land or water . . . . [*Woolrych, Law of Waters* 272 (1st Amer. ed. 1853)]

Parliament has the power to extinguish the public trust by grant or in any other way it sees fit. [Note, "The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine," 79 *Yale L. Jour.* 762, 771 (1970)][3]

In commenting upon the contention that public trust lands and waters may be beyond legislative reach, one authority in this field has remarked,

---

[3]An argument can certainly be made that this legislative power in England rested upon the doctrine of Parliamentary supremacy, which finds no counterpart in this country. Even so, we search in vain for any act or circumstance that placed an inhibition on legislative assertion of power as the doctrine of the public trust came to our shores and made its way into our jurisprudence. It may well be

If the trusteeship puts such lands wholly beyond the police power
of the state, making them inalienable and unchangeable in use, then
the public right is quite an extraordinary one, restraining govern-
ment in ways that neither Roman nor English law seems to have
contemplated. [Sax, "The Public Trust Doctrine in Natural Re-
source Law: Effective Judicial Intervention," 68 *Mich. L. Rev.* 471,
477 (1970)]

My purpose here, however, is not to reach any conclu-
sion on the issue of legislative control of public trust lands
and waters, but rather to suggest that no authoritative body
or statement of law with respect thereto can be said to exist
in this State at this time. This being so, it seems to me im-
provident to rule now that great stretches of our most valu-
able beach properties shall be subject to this amorphous and
ill-defined doctrine. If the Legislature is found to possess
powers and responsibilities with respect to these properties —
as I strongly suspect it should and will be — it may have
quite different ideas as to how these matters should be
handled. Until the contours of the public trust doctrine
have been more precisely defined, I suggest that the admirable
solution of the Appellate Division be adopted.

## II

A possibly more important consideration militates against
the action taken by the majority. There are very strong
grounds for believing that inclusion of municipally owned
dry sand beaches within the public trust doctrine — making
them at once indiscriminately available to all members of
the public — constitutes a compensable taking. An almost
identical issue has recently been so resolved in Massachusetts.

In *Opinion of the Justices,* 365 *Mass.* 681, 313 *N. E.*
2d 561 (1974) the Supreme Judicial Court was called upon
to render an advisory opinion to the Legislature as to whether
a proposed bill, if enacted into law, would or would not be

that legislative superintendence should be subject to judicial review
in the public interest. But none of this is clear at this time.

constitutional. The bill proposed to establish "a public on-foot free right-of-passage along the shore of the coastline, between the mean high water line and the extreme low water line," subject to certain restrictions and limitations.[1] The right-of-passage would apply to the coastline throughout the entire Commonwealth.

The Court first held that the rights of the public did not include any right to walk on the beach. Public trust rights were confined, the Court said, to fishing, fowling and navigation and interests accessory thereto. This holding is of course contrary to this Court's decision in *Avon* and could not be said to represent the law of our State at the present time. *Avon* was cited by the Massachusetts court, but with only enigmatic comment and was not followed.

The Court next determined that the proposed creation of the right-of-passage, permitting as it did the intrusion of persons upon property otherwise private, would constitute a compensable taking.

The permanent physical intrusion into the property of private persons, which the bill would establish, is a taking of property within even the most narrow construction of that phrase possible under the Constitution of the Commonwealth and of the United States.

\* \* \* \* \* \* \* \*

The interference with private property here involves a wholesale denial of an owner's right to exclude the public. If a possessory interest in real property has any meaning at all it must include the general right to exclude others. [313 N. E. 2d at 568]

Having found that there would be a compensable taking, the Court next considered certain provisions in the proposed

---

[4]In Massachusetts, unlike New Jersey, private titles normally extend as far as the mean low-water mark or for a distance of 100 rods from the mean high-water line, whichever is the lesser measure. Accordingly the proposed right-of-passage would traverse the private land of owners of the littoral. [313 N. E. 2d at 565] It would be otherwise in this State because here private titles extend only to mean high-water mark. *Bailey v. Driscoll*, 19 N. J. 363, 367 (1955).

bill purporting to afford compensation, and found them to be constitutionally inadequate.

Finally, the Court pointed out that certain other clauses in the bill seemed "to transfer from the Legislature to the courts not merely the decision on the amount of compensation but also the decision whether or not to compensate, that is, whether or not to exercise the power of eminent domain." To the extent that this transfer were accomplished, said the Court, the bill would be unconstitutional under the doctrine of the separation of powers. "The power of eminent domain is a legislative power." 313 *N. E.* 2d at 569. The taking power, it pointed out, may never be exercised by the judiciary.

The opinion concludes that were the bill to be enacted into law, it would violate the Constitution of the Commonwealth of Massachusetts as well as the Fourteenth Amendment to the Constitution of the United States.

The relevance of this opinion to the case at bar seems plain. This Court decided in *Avon,* and made more explicit today, that a new kind of property — dry sand upland beach — comes within the contours of the public trust doctrine. No court had ever so held before. See Note, 42 *Cin. L. Rev.* 554, 560 (1973). When later faced with an all but identical issue, the Massachusetts Court ruled the other way. It thus avoided the problems which we in New Jersey must face.

The first of these problems is whether or not there has been a taking. As to this, I submit there can be no possible doubt. Of course there has been a taking. The Borough of Deal, owner of the beach, itself created the dry sand area entirely at its own expense with the purpose of restricting the upper part of the beach to use solely by its own residents. This portion of the beach has never been dedicated to the public at large and has never, until now, been available for use by the general public. As the Massachusetts Court observed,

If a possessory interest in real property has any meaning at all it must include the general right to exclude others. [313 *N. E.* 2d at 568]

See, further, 2 *Nichols, Eminent Domain* (3rd ed. 1976), § 5.1[1].

Also instructive is the recent decision in *United States v. 10.0 Acres,* 533 *F.* 2d 1092 (9th Cir. 1976).[5] There the government took what had been an exclusive easement and converted it into a public road. The condemning authority insisted it was a non-compensable taking because the condemnee retained his original right of use. A majority of the court felt otherwise, holding that the condemnee had been deprived of the exclusivity which he had previously enjoyed — the right to exclude others. The court agreed with the landowner's contention that the government's action had converted his "quiet wooded sanctuary into just another 'house by the side of the road.'" 533 *F.* 2d at 1095.

The fact that the property taken in this case was owned by a municipality rather than by a private individual makes no difference. It is the accepted law of New Jersey that municipal property, at least if not held in a governmental capacity, when taken by the State, must be paid for. There must be compensation. *State Highway Com. v. Elizabeth,* 102 *N. J. Eq.* 221, 226 (Ch. 1928), aff'd 103 *N. J. Eq.* 376 (E. & A. 1928). Indeed it has been suggested that the State must compensate a municipality for property taken even if it be held in a governmental capacity. *State v. Cooper,* 24 *N. J.* 261, 269–70 (1957). *See also State v. Township of South Hackensack,* 65 *N. J.* 377 (1974).

The second problem relates to the manner in which the taking has come about. As indicated above, the power of eminent domain is a legislative and not a judicial power. The leading treatise on this subject states it thus:

---

[5]The case is noted in 63 *Va. L. Rev.* 135 (1977).

> Under the customary division of governmental power into three branches, executive, legislative and judicial, the right to exercise the power of eminent domain is legislative, and there can be no taking of private property for public use without the consent of the owner in the absence of direct authority from the legislature. The power of eminent domain lies dormant until legislative action is had, pointing out the occasions, modes, agencies and conditions for its exercise. [1 *Nichols on Eminent Domain* § 3.2 (3rd ed. 1976)]

There has been no legislative action with respect to the matter we are considering.

To sum up what has happened: The Borough of Deal, using only its own funds, constructed a beach where there had been no beach before. It did this solely for the pleasure and benefit of its residents. There was nothing in the law to suggest that this could not or should not be done. Suddenly the magic wand labeled "public trust" is gently waved and, lo and behold, what had been a beach reserved solely for residents of the Borough has been transformed into a beach open to the general public. It matters not at all in what terms this bit of judicial legerdemain is couched. The fact remains that one right in the bundle of rights we call ownership has been destroyed — the right to exclude others. There has been a compensable taking, accomplished by judicial act. But the judiciary may not exercise the power of eminent domain!

## III

In brief recapitulation, it is my view that no more land or water should be found to come within the ambit of the public trust until such time as the scope and contours of this doctrine are made clear. It is especially necessary to decide what role, if any, the Legislature is entitled or required to play.[6] There should also be an initial determination as to

---

[6] It is my understanding that a case is now pending which will provide an appropriate vehicle for the definitive resolution of these issues. They cannot well be decided here, having been neither discussed nor briefed.

whether the inclusion of municipally owned dry beach land within the public trust — making it available to indiscriminate usage — is or is not a compensable taking and whether the judiciary should purport to exercise the taking power.

Justice SCHREIBER joins in the introduction and Part I of this opinion.

*For reversal*—Chief Justice HUGHES and Justices SULLIVAN, PASHMAN, CLIFFORD and HANDLER—5.

*For affirmance*—Justices MOUNTAIN and SCHREIBER—2.