727 A.2d 491 (1999)
320 N.J. Super. 405
STATE Of New Jersey, Plaintiff-Respondent,
v.
Mark OLIVER, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Larry W. Schmidt, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Luke Morgan, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 16, 1999.
Decided April 13, 1999.
*493 Michael I. Halfacre, Little Silver, for defendant-appellant Mark Oliver in A-7124-96T3.
Peter M. O'Mara, Red Bank, for defendants-appellants Larry W. Schmidt in A-7268-96T1 and Luke Morgan in A-7303-96T1.
Mark P. Stalford, Assistant Prosecutor, for plaintiff-respondent in all three appeals (John Kaye, Monmouth County Prosecutor, attorney; Mr. Stalford, of counsel; Scott D. Leff, on the briefs).
Janice B. Venables, Ocean, for plaintiff-respondent in all three appeals, Borough of Spring Lake (Evans, Osborne, Kreizman & Bonney, attorneys; Ms. Venables, of counsel; Christine Giordano Hanlon, on the briefs).
Stephen J. Foley, Jr., Asbury Park, for amicus curiae in all three appeals, Surfers' Environmental Alliance-New Jersey (Campbell, Foley, Lee, Murphy & Cernigliaro, attorneys; Mr. Foley, on the briefs).
Before Judges LONG, KESTIN and CARCHMAN.
*492 The opinion of the court was delivered by CARCHMAN, J.A.D.
During the early morning hours of July 13, 1996, the Borough of Spring Lake fell victim to the ravages of Tropical Storm Bertha. *494 The storm generated sixty to seventy mile per hour winds and high surf along the beachfront including water encroaching on Ocean Avenue. The beaches were closed and lifeguard stands and other equipment moved from the beach area to prevent damage caused by the high surf. By 2:00 p.m., the wind had shifted from the northeast to the west, and the weather began to clear. The police chief, lifeguard captain and Borough beach manager, accompanied by other police officers, met and determined that the beach would be closed to the public for the rest of the day. Red flags indicating a closed beach condition were posted along the beach. At approximately 4:00 p.m., four individuals including persons later identified as defendants Mark Oliver, Larry Schmidt and Luke Morgan were observed surfboarding in the ocean near the Mercer Avenue beach. After an extended effort to gain defendants' attention, they came ashore and were charged with two disorderly persons violationscreating a hazardous or physically dangerous condition by an act which serves no legitimate purpose of the actor, N.J.S.A. 2C:33-2a(2), and obstructing the administration of law, N.J.S.A. 2C:29-1a; and two municipal violationsMunicipal Ordinance 14-2.10, authorizing the closing of beaches, and Municipal Ordinance 14-2.1, prohibiting bathing under certain conditions.
After a trial in the Spring Lake Municipal Court, defendants were found guilty of N.J.S.A. 2C:33-2a(2) and Municipal Ordinance 14-2.1. The trial court merged the Municipal Ordinance 14-2.10 complaint into the Municipal Ordinance 14-2.1 conviction, and N.J.S.A. 2C:29-1a complaint into the N.J.S.A. 2C:29-2a(2) conviction. Defendants were sentenced to an aggregate fine of $475 and four days of community service together with costs. On the de novo appeal to the Law Division, defendants were found guilty of the same offenses, and the same sentences were imposed. Defendants appeal,[1] and we affirm.
On appeal, defendant Oliver raises the following arguments:
POINT I THE COURT'S DENIAL OF DEFENDANT'S REQUESTED SUBSTITUTION OF ATTORNEY DENIED THE DEFENDANT EFFECTIVE ASSISTANCE OF COUNSEL, AND IN LIGHT OF THE APPARENT CONFLICT OF INTEREST, PREJUDICE TO THE DEFENDANT MUST BE PRESUMED.
POINT II A REVIEW OF THE PROCEEDINGS BELOW MANDATES A FINDING OF NOT GUILTY, AS THE STATE DID NOT PROVE ALL THE ELEMENTS OF THE OFFENSES CHARGED THAT ARE NECESSARY TO SUSTAIN CONVICTIONS.
POINT III THE ORDINANCES OF THE BOROUGH OF SPRING LAKE UNDER WHICH THE DEFENDANT HAS BEEN CONVICTED ARE UNCONSTITUTIONALLY VAGUE ON THEIR FACE.
POINT IV THE ORDINANCES OF THE BOROUGH OF SPRING LAKE UNDER WHICH THE DEFENDANT HAS BEEN CONVICTED ARE UNCONSTITUTIONAL AS APPLIED.
POINT V THE MUNICIPAL COURT OF THE BOROUGH OF SPRING LAKE LACKS TERRITORIAL JURISDICTION OVER OFFENSES COMMITTED BEYOND THE TERRITORIAL BOUNDARIES OF THE BOROUGH.
POINT VI THE DEFENDANT'S CONVICTION FOR A VIOLATION OF BOROUGH ORDINANCE 14-2.1 MUST BE REVERSED BECAUSE IT FAILS TO PROVIDE A PENALTY CLAUSE.
Defendants Schmidt and Morgan raise the following arguments:
POINT I DISMISSAL IS WARRANTED IN THE INSTANT CASE ON THE GROUND THAT THE ORDINANCE WHICH [DEFENDANTS HAVE] BEEN FOUND GUILTY OF VIOLATING IS UNCONSTITUTIONAL.
POINT II THE SPRING LAKE MUNICIPAL COURT LACKED TERRITORIAL JURISDICTION OVER ACTS WHICH OCCURRED BEYOND THE BOUNDARIES OF THE TOWN.
*495 POINT III THE STATE FAILED TO ESTABLISH THE MUNICIPAL ORDINANCE AND CRIMINAL STATUTE VIOLATION BEYOND A REASONABLE DOUBT, THEREBY WARRANTING ACQUITTAL.
An analysis of defendants' positions requires an expanded exposition of the facts adduced at the trial.
As the storm began to wane during the afternoon, Robert Dawson, Chief of the Spring Lake Police Department (S.L.P.D.), Daniel Finn, the beach manager, and Robert Crader, the Captain of the lifeguards, met at approximately 2:00 p.m. to discuss the beach conditions. Because they determined that the surf conditions were still too dangerous indeed the police had been required to save one swimmer at approximately 1:30 p.m. they decided to keep the beaches closed for the remainder of the day, to post red flags on all of the beaches indicating that bathing was prohibited, and to instruct all on-duty police officers to enforce the closure with summonses and arrests. According to Finn, all the beaches displayed red flags by approximately 3:10 p.m.
At 4:00 p.m., Special Officer Brian Sherman of the S.L.P.D. observed four surfers, including the three defendants, in the ocean at the Mercer Avenue beach. Sherman parked his three-wheeled "Cushman" on the boardwalk, activated its overhead red flashing lights and attempted to advise the surfers to come in by standing on the boardwalk's railing while blowing his whistle and waving his arms. Sherman was joined by Special Officer Canal, Officer Baker, and Patrolmen Oberto, Zoino and Ploskonka, all of the S.L.P.D. For approximately the next hour, the officers focused their efforts on convincing defendants to exit the ocean, but defendants never responded.
During the hour-long incident, the S.L.P.D. positioned two Cushmans on the boardwalk with their red flashing lights activated, and the six officers blew their whistles and waved their arms intermittently. At the same time, a crowd of approximately 100 people gathered on the boardwalk to watch the spectacle. Also, at least one surfer rode a wave in and paddled back out as an officer approached. While they were not directly facing the shore the entire time, defendants were observed occasionally looking at the officers on the beach. Finally, even though one of the surfers, not a defendant here, surrendered to the police at approximately 4:30 p.m., defendants remained in the water for an additional half-hour. The officers concluded that they had gained defendants' attention, but defendants chose to ignore their efforts.
Rather than send the lifeguards into the dangerous surf to retrieve the defendants, the police contacted the United States Coast Guard at the Shark River Station for assistance. The Coast Guard quickly responded to the S.L.P.D.'s call. John Foley, a crewman on the responding vessel, observed that he could see the police on shore and hear their whistles from his position, approximately twenty yards farther out to sea than defendants. Foley informed defendants that they had to exit the water, which they then did. Defendants were then arrested by the S.L.P.D. at approximately 5:00 p.m.
Because no one witnessed defendants actually enter the water, it was not known whether red flags were posted when they first entered the water. Nevertheless, a lifeguard stand was face down at the top of the Mercer Avenue beach all day with the sign "Life Guards Off DutyNo Bathing" clearly posted, and there was evidence that the red flags were posted by 3:10 p.m.
While there were no actual emergencies or calls which the S.L.P.D. or lifeguards were prevented from responding to during the incident, the six officers and two extra lifeguards were kept from their regular duties by the defendants' actions and were "tied up" at the Mercer Avenue beach for at least one hour. Judge Chaiet, in the Law Division, adopted the Municipal Court's findings that the beach was closed, surfing was prohibited and defendants were aware of these facts. Accordingly, defendants were found guilty.
On appeal, defendants and Surfers' Environmental Alliance-New Jersey (SEA-NJ), as amicus curiae, challenge the jurisdiction of the Municipal Court to consider these matters arguing that they should properly *496 have been heard in the Superior Court. Defendants and SEA-NJ argue that the Public Trust Doctrine precludes adjudication of these offenses in the municipal court. We disagree.
Both the territorial and subject matter jurisdiction of the municipal court are determined by the Legislature. N.J.S.A. 2B:12-16(a) grants to the municipal court territorial jurisdiction over "cases arising within the territory of that municipality ... includ[ing] any premises or property located partly in and partly outside of the municipality." In addition to establishing territorial jurisdiction of the municipal court, the Legislature also enabled the municipality to enact ordinances to create subject matter jurisdiction. N.J.S.A. 40:48-1(9) empowers municipalities to make and enforce ordinances to, among other things, "[r]egulate or prohibit swimming or bathing in the waters of, in, or bounding the municipality." The same statute enables municipalities to "[e]stablish, maintain, regulate and control a lifeguard upon any beach within or bordering on the municipality." N.J.S.A. 40:48-1(27). N.J.S.A. 40:61-22.20 grants "[t]he governing body of any municipality bordering on the Atlantic ocean ... exclusive control, government and care thereof and of any boardwalk, bathing and recreational facilities, ... and [it] may, by ordinance, make and enforce rules and regulations for the government and policing of such lands, boardwalk, bathing facilities." There can be little doubt that the municipality may appropriately regulate activities on the beaches and waters "bounding" the municipality.
Defendants and SEA-NJ argue that the Public Trust Doctrine defines the territorial limits of municipal court jurisdiction. The Public Trust Doctrine derived "from the ancient principle of English law that land covered by tidal waters belonged to the sovereign, but for the common use of all the people." Borough of Neptune City v. Borough of Avon-by-the-Sea, 61 N.J. 296, 303, 294 A.2d 47 (1972) (setting forth a complete history of the doctrine); see also Matthews v. Bay Head Improv. Ass'n, 95 N.J. 306, 471 A.2d 355, cert. denied, 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). The rights granted by the doctrine extend "to recreational uses, including bathing, swimming and other shore activities." Id. 61 N.J. at 309, 294 A.2d 47. The Public Trust Doctrine applies to lands seaward of the mean high water mark which are held by the State in fee simple for the trust of its citizens. Id. at 300, 294 A.2d 47.
Defendants and SEA-NJ argue that since "title" ends at the mean high water mark, municipal court jurisdiction ends at that same point. The argument is flawed by a misunderstanding of the underlying premise and purpose of the doctrine. The Public Trust Doctrine is a rule protecting property rights of the citizenryit is not a declaration of the limits of territorial jurisdiction. The doctrine grants rights to the public which cannot be altered or alienated without consideration of the public's rights in such lands. The identification of title ownership does not resolve the issue. Property owned by the State or any other owner (exclusive of a Federal enclave) falling in whole or in part within the territory of the municipality is subject to the jurisdiction of the municipal court under such terms and conditions as the Legislature shall determine.
The right of the public to enjoy that property encompassed by the doctrine is not inconsistent with the right of the sovereign, as trustee, to protect those utilizing such property. This is the essence of the government's inherent authority, if not its obligation, to act in the interest of the public safety and welfare, an issue we address more fully infra. See Matthews, supra, 95 N.J. at 332, 471 A.2d 355; Van Ness v. Borough of Deal, 78 N.J. 174, 178, 393 A.2d 571 (1978) ("Of course, the municipality in the exercise of its police power and in the interest of public health and safety, would have the right to adopt reasonable regulations as to the use and enjoyment of the beach area."). Such action may take the form of the legitimate exercise of police power, for example, to close beaches and preclude use of property, even that falling within the Public Trust Doctrine, when the public safety and welfare is threatened. From such authority the sovereign can confer jurisdiction and cede regulatory authority to municipalities *497 and their courts. The Legislature has vested such authority and jurisdiction in the Borough and its municipal court. Defendants' arguments to the contrary are rejected.
We need not, on these facts, determine the outer limits of such jurisdiction or the further relationship between the Public Trust Doctrine and territorial jurisdiction. We are comfortable in concluding that defendants, here, fell well within any such limits. The Law Division found that the police officers' entreaties to defendants could be seen and heard by defendants as they were by the Coast Guard. Defendants were within a legitimate zone of concern of the police and lifeguard units entrusted with the safety of bathers, swimmers, boaters, surfers and anyone else utilizing the recreational facilities secured and maintained by Spring Lake. The same obligation placed on the police and lifeguards to protect defendants dismantles defendants' argument that their territorial obligation somehow ends at an arbitrary line. Cf. Fleuhr v. City of Cape May, 303 N.J.Super. 481, 697 A.2d 182 (App.Div.) (imposing civil liability for negligent performance of protective beach services for municipal property but denying liability when injuries occur solely due to conditions encountered in an unimproved body of water), certif. granted, 152 N.J. 12, 702 A.2d 351 (1997).
We must next consider SEA-NJ's contention that the jurisdictional statutes are impermissibly vague. The constitutional doctrine of vagueness is "essentially a procedural due process concept grounded in notions of fair play." State v. Saunders, 302 N.J.Super. 509, 520, 695 A.2d 722 (App. Div.) (quoting State v. Lashinsky, 81 N.J. 1, 17, 404 A.2d 1121 (1979)), certif. denied, 151 N.J. 470, 700 A.2d 881 (1997). The Supreme Court summarized the underlying concerns as follows:
Clear and comprehensible legislation is a fundamental prerequisite of due process of law, especially where criminal responsibility is involved. Vague laws are unconstitutional even if they fail to touch constitutionally protected conduct, because unclear or incomprehensible legislation places both citizens and law enforcement officials in an untenable position. Vague laws deprive citizens of adequate notice of proscribed conduct, and fail to provide officials with guidelines sufficient to prevent arbitrary and erratic enforcement.

[State v. Mortimer, 135 N.J. 517, 532, 641 A.2d 257 (quoting State v. Afanador, 134 N.J. 162, 170, 631 A.2d 946 (1993)), cert. denied, 513 U.S. 970, 115 S.Ct. 440, 130 L.Ed.2d 351 (1994).]
Quite simply, therefore, "[a] criminal statute is not impermissibly vague so long as a person of ordinary intelligence may reasonably determine what conduct is prohibited so that he or she may act in conformity with the law." Saunders, supra, 302 N.J.Super. at 520-21, 695 A.2d 722. Stated another way, the test for vagueness hinges on whether "persons `of common intelligence must necessarily guess at [the statute's] meaning and differ as to its application.'" Mortimer, supra, 135 N.J. at 532, 641 A.2d 257 (citation omitted). Further, analysis under this standard is not "`a linguistic analysis conducted in a vacuum' but requires consideration of the questioned provision itself, related provisions, and the reality in which the provision is to be applied." Saunders, supra, 302 N.J.Super. at 521, 695 A.2d 722 (citation omitted). Finally, unless the statutory framework suggests otherwise, "the words used in a statute carry their ordinary and well-understood meanings." Mortimer, supra, 135 N.J. at 532, 641 A.2d 257 (citation omitted); see also Lashinsky, supra, 81 N.J. at 18, 404 A.2d 1121 (adding common intelligence, coupled with "ordinary human experience," to the assessment of "vagueness"). Indeed, after repeating this common-sense standard in Mortimer, the Supreme Court analyzed the challenged statute by referencing Webster's New Collegiate Dictionary to define certain terms. Mortimer, supra, 135 N.J. at 532, 641 A.2d 257.
Here, SEA-NJ contends that the enabling statutes are impermissibly vague because they fail to precisely define waters "bounding the municipality," N.J.S.A. 40:48-1(9), beaches "bordering on the municipality," N.J.S.A. 40:48-1(7), and the exact meaning of "bathing facilities," N.J.S.A. 40:61-22.20. However, we conclude these terms are sufficiently precise to satisfy due process.
*498 "Bounding" is defined as "[b]order[ing] on another country, state, or place: adjoin[ing]." Webster's II New Collegiate Dictionary 131 (1995). "Bordering" is defined as "[lying] along or adjacent to the border of." Id. at 128. As we need not define the outer limits of territorial jurisdiction, so, too, we need not define the outer limits of "bounding" or "bordering" to resolve this appeal. We previously noted that defendants were well within the sight and sound of the lifeguards, police and on-lookers assembled on the beach and boardwalk. More significantly, they were within what we have characterized as the "zone of concern" of rescue operations so that if they were in distress the lifeguards were able to attend to their needs. We conclude that the Municipal Court of Spring Lake had jurisdiction over the charged offenses.
Next, defendants and SEA-NJ contend that the municipal ordinances under which defendants were convicted are unconstitutional. Spring Lake Municipal Ordinance 14-2.1 provides:
Protected and Established Oceanfront Beaches. No person or persons shall bathe upon the oceanfront in the Borough of Spring Lake except at certain protected and established bathing beaches where lifeguards, boats, flags, buoys and other protective devices are provided.
[ (Emphasis added).]
Ordinance 14.2.10 provides:
Lifeguards. Lifeguards shall be on duty at the bathing areas between 9:00 a.m. and 6:00 p.m. daily during the bathing season. When bathing shall be determined to be unsafe and prohibited by the Chairman of the Beach Committee or the Beach Manager, flags shall be displayed and lifeguard stands shall be turned down indicating that the beaches are closed and unguarded.
Specifically, defendants and SEA-NJ contend that the terms "bathe" and "bathing" are impermissibly vague; that the ordinances are not uniformly enforced, adding to their inability to determine whether their conduct was proscribed; and that the ordinances fail to provide a penalty clause.
Defendants challenge the ordinances as vague both facially and "as applied." An ordinance is facially vague if "there is no conduct that it proscribes with sufficient certainty." Saunders, supra, 302 N.J.Super. at 521, 695 A.2d 722 (citations omitted). On the other hand, an ordinance is vague "as applied" if it does not "clearly prohibit the conduct on which the particular charges were based." Ibid.
Defendants' and SEA-NJ's arguments as to the definition of "bathing" have no merit. The term "bathe" is defined, among other ways: "[t]o become immersed in or as if in a liquid." Webster's II New Collegiate Dictionary 94 (1995). "Bathing" is something more passive than surfing or even swimming; it is in simplest terms "entering the water" resulting in "immersion in water." Defendants were surfing. As this activity necessarily included placing one's body in the water, surfing cannot be accomplished without a certain degree of bathing. The purpose of the ordinance prohibiting "bathing" was not simply to stop people from swimming; it was to preclude them from going into the water for any purposeswimming, surfboarding, body surfing or any other recreational activity involving "immersion" in water. While not a paradigm of structure or clarity, the ordinance is obvious as to its purpose and intentto prevent people from entering the water when the beach is closed. Defendants' argument that Municipal Ordinance 14-2.15[2] requires a different result is spurious. The limitation on surfing provided for in Ordinance 14-2.15 represents restrictive legislation focusing on a stated set of circumstances. It is neither a limitation on the Borough's ability to close the beaches *499 and water to all in the interest of public health and safety nor a license for surfers to surf at any time they so choose.
Defendants and SEA-NJ argue that their safety in the water should be a matter of self-determination. They argue that the ultimate decision as to whether conditions are safe and appropriate is theirs to make and such decision is not precluded by the statutory scheme for beach and water regulation set forth in the Spring Lake ordinances. Their expansive view of their rights is distorted. The ability to regulate the beaches and water is grounded in the public safety and welfare. The closing of the beaches and preclusion of bathing was based on this authority; in fact, the Borough's decision could not be challenged in this prosecution of defendants' conduct.[3] The entire regulatory scheme and exercise of discretionary authority to preclude bathing and temporarily close recreational facilities based on potential danger is a function not only of concern for public safety but of common sense. Self-determination is not relevant. Youthful intimations of immortality cannot serve as the touchstone of measuring reasonable conduct. It is not the surfers who will ultimately decide whether they can defy indisputably reasonable public safety decisions based on weather conditions when, in defendants' view, those conditions create the perfect environment for their sport. And they cannot avoid the consequences of such conduct by suggesting that an ordinance which is clear as to content and meaning is somehow "vague."[4]
Defendants contend that the State failed to prove all of the elements of the offenses for which they were convicted. While Schmidt and Morgan challenge their convictions under both N.J.S.A. 2C:33-2a(2) and Ordinance 14-2.1, Oliver challenges only his conviction under N.J.S.A. 2C:33-2a(2).
Appellate review of municipal court convictions is "exceedingly narrow." State v. Locurto, 157 N.J. 463, 470, 724 A.2d 234 (1999). In both the Law and Appellate Divisions, the court
must review the record in the light of the contention, but not initially from the point of view of how it would decide the matter if it were the court of first instance. It should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.
The aim of the review at the outset is rather to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record.
[Ibid. (quoting State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964)).]
This standard of substantial deference is even more compelling where two lower courts enter concurrent judgments on factual issues. "Under the two-court rule, appellate courts ordinarily should not undertake to alter concurrent findings of facts and credibility determinations made by two lower courts absent a very obvious and exceptional showing of error." Id. at 157 N.J. at 474, 724 A.2d 234.
The record clearly supports defendants' convictions. N.J.S.A. 2C:33-2a(2) provides, in relevant part, "[a] person is guilty of a petty disorderly persons offense, if with the purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he . . . [c]reates a hazardous or physically dangerous condition by any act which serves no legitimate purpose of the actor." As discussed previously, the municipal ordinance proscribes "bathing upon the *500 oceanfront" at closed beaches. Defendants entered the water to surf when the beach was closedthe lifeguard stands were down and pulled back nearly off of the beach. More egregiously, despite the hour-long effort of at least six Spring Lake police officers, defendants chose to ignore the officers and remain in the water until the Coast Guard intervened. As a result of remaining in the dangerous surf, defendants created a dangerous condition, or, at the very least, a risk thereof, to themselves and the police and lifeguard personnel who would have been required to save defendants had an emergency arisen. Furthermore, defendants' actions restricted the police's and lifeguards' activity for an extended period of time, obstructing their ability to attend to their normal duties. This fact was of added significance in light of damage sustained by the Borough during the tropical storm. There is no basis for disturbing Municipal Court Judge Barry's and Superior Court Judge Chaiet's determinations that defendants were well aware that the beach was closed but decided to stay in the water to surf, disregarding the possible repercussions to the public.
Finally, defendant Oliver contends that the denial of his requested substitution of attorney deprived him of effective assistance of counsel mandating a dismissal of the charges against him or a new trial. Under both the Sixth Amendment to the Federal Constitution and Article I, paragraph 10 of the New Jersey Constitution, a criminal defendant has the right to effective assistance of counsel which is "`untrammeled and unimpaired' by conflicting interests." State v. Norman, 151 N.J. 5, 23, 697 A.2d 511 (1997) (quoting State v. Bellucci, 81 N.J. 531, 538, 410 A.2d 666 (1980) (quoting Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680, 699 (1942))).
In State v. Land, 73 N.J. 24, 372 A.2d 297 (1977), the Supreme Court addressed whether this right to effective assistance was violated by a single attorney's representation of multiple co-defendants in the same trial. The Court described the problem as follows:
A conflict of interests, then, need not necessarily consist of an obvious inconsistency of defenses among multiple defendants. It is quite sufficient to constitute a fatal conflict if counsel is precluded, because of diverging interests of codefendants, from representing either defendant with that degree of proficiency and forcefulness of defense which he would exhibit if either were his sole client. Where an attorney is impeded from doing his best, he is not only inadequate, but constitutionally "ineffective."
[Id. at 31, 372 A.2d 297 (citations omitted).]
The Court determined that trial courts confronted by an attorney representing multiple co-defendants should instruct the defendants as to the potential perils of joint representation. Naturally, such defendants would then be free to waive their right to independent counsel if they so chose. Id. at 32-33, 372 A.2d 297. Finally, the Court concluded that, "in the absence of waiver, if a potential conflict of interest exists, prejudice will be presumed resulting in a violation of the New Jersey constitutional provision guaranteeing the assistance of counsel." Id. at 35, 372 A.2d 297.
In State v. Bellucci, 81 N.J. 531, 410 A.2d 666 (1980), the Court reiterated and strengthened the presumption created by Land:
The harm in dual representation is caused by the restraints placed on an attorney's advocacy and independent judgment. It is one of divided loyalties. At its extreme, such conflict may prevent counsel from attempting to exonerate one client when doing so would require him to demonstrate that another client is guilty. The harmful effects of a conflict of interest what counsel must refrain from asserting will not ordinarily be identifiable on the record. Requiring a showing of prejudice would place an impossible burden on the accused and force the reviewing courts to engage in "unguided speculation."
[Id. at 543, 410 A.2d 666 (citations omitted).]
The Court recognized that its rule "amounts to an absolute bar to multiple representation unless defendants are fully advised of the problems involved." Id. at 545, 410 A.2d 666; *501 see Norman, supra, 151 N.J. at 24-25, 697 A.2d 511 (noting Bellucci created rule that simultaneous dual representation of criminal co-defendants by a private attorney or lawyer associated with that attorney was per se potential conflict, and prejudice would be presumed absent valid waiver).
Here, the unique facts of the offenses presented do not suggest the necessity for application of the sweeping, prophylactic rule of Bellucci. Cf. State v. Bell, 90 N.J. 163, 167-71, 447 A.2d 525 (1982) (holding multiple representation by associates in a public defender's office does not give rise to Bellucci per se potential conflict with presumed prejudice).
All defendants were originally represented by Peter M. O'Mara. A short time before trial, the prosecutor indicated that a pretrial statement by defendant Oliver, which was known to all parties, was going to be introduced at trial.[5] In the Municipal Court, the trial judge indicated that there was no conflict or potential for such a conflict since he would only consider the statement as against Oliver's interest. At the trial de novo in the Law Division, Judge Chaiet disregarded the statement in its entirety. Additionally, each defendant was separately charged for offenses based on independent conduct which did not implicate the other defendants. Their conduct was observed by nearly a hundred onlookers.
Defendants did not deny the conduct; in fact, their arguments were essentially legal ones ranging from the sufficiency of the proofs to constitutionality of the ordinances under which they were charged. Beyond Oliver's statement, which was neither germane nor considered by Judge Chaiet in the Law Division, defendants' interests were not divergent, and there were no divided loyalties that prevented counsel from representing each defendant as if he was counsel's sole client. We note that Oliver acknowledged this much in his brief, and, even as this issue was argued before us, defendants Morgan and Schmidt were represented by single counsel. While a better practice would have been served by inquiry by the Municipal Court of defendants on the issue of dual representation, the failure to do so here did not render their well-grounded convictions unconstitutionally infirm.
We have considered the additional arguments raised by defendants and SEA-NJ and conclude that they are without merit and require no further discussion. R. 2:11-3(e)(2).
We affirm the convictions.
NOTES
[1] These appeals have been consolidated for this opinion.
[2] Municipal Ordinance 14-2.15 provides:

a. No person or persons shall use surfboards or rafts or other appliances which might cause injury to bathers or swimmers upon the beach or the beachfront or in the waters adjacent thereto without permission of the lifeguard at the bathing area.
b. Surfboard riding shall be restricted at all times to those areas of the beach designated either by resolution of the Mayor and Council or by written direction of the Beach Manager.
[3] Presumably an action to challenge the closure decision could have been filed in the Law Division as an action in lieu of prerogative writs. R. 4:69.
[4] In a different factual context, Justice Clifford made the following observation:

One need not be a lawyer or wordsmith or semanticist to understand that a statute proscribing the volunteering of false information to a law-enforcement officer is violated when Denny Valentin, wanted on a stolen vehicle charge, tells a state trooper that his name is Ramon Velez. I do not think the crowd down at the corner newsstand would have nearly the trouble with this simple, eminently sensible statute that this Court has.
[State v. Valentin, 105 N.J. 14, 24, 519 A.2d 322 (1987) (Clifford, J., dissenting).]
[5] The statement was made by Oliver at a meeting of the Spring Lake Borough Council in July 1996. He said, "[T]he only warning was a red flag. We figured we were going to get arrested so we decided to catch a few waves."